UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

     Plaintiff,

v.                                Case No. 06-14891

DELPHI CORPORATION,           HONORABLE AVERN COHN
J.T. BATTENBERG, III, ALAN
DAWES, PAUL FREE, JOHN BLAHNIK,
MILAN BELANS, CATHERINE ROZANSKI,
JUDITH KUDLA, SCOT MCDONALD, B.N.
BAHADUR, ATUL PASRICHA, LAURA MARION,
STUART DOYLE and KEVIN CURRY,

     Defendants.

_____/


**MEMORANDUM AND ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS**

# TABLE OF CONTENTS

I.     Introduction                                                                                1

II.    Background                                                                                  2

III.   Legal Standards                                                                            3
       A.     Pleading Standards                                                         3
       B.     Securities Laws/Rules                                                      5
              1.     Section 10(b) and Rule 10b-5 and Section 17(a)       5
                     a.     The Statute and Rules                                       5
                     b.     The Elements - including Scienter                      6
              2.     Section 13(a) and Rules 12b-20 and 13a-1              8
              3.     Section 13(b)                                                             9
              4.     Section 20(e)                                                            10

IV.    Judith Kudla                                                                               10
       A.     Background and Allegations Against Kudla                    10
       B.     Kudla's Arguments                                                          12
       C.     Analysis                                                                          13
              1.     Pleading Requirements                                            13
              2.     Failure to State a Claim                                           14
                     a.     Violation of Section 17(a)                                14
                     b.     Violation of 10(b) and Rule 10b-5              16
                     c.     Aiding and Abetting Claims                             17
                     d.     Section 13(b)(5) and Rule 13b2-1                    18
              3.     Other Arguments                                                    19
                     a.     Statute of Limitations                                      19
                     b.     Injunctive Relief and Disgorgement               19

V.     John Blahnik                                                                              20
       A.     Background and Allegations Against Blahnik                  20
       B.     Blahnik's Arguments                                                       27
       C.     Analysis                                                                          27
              1.     Primary Violations - 10(b) and 17(a)                     27
              2.     In Connection With Requirement                            28
              3.     Section 13 and Rule 13 Violations -                       28
                     Primary and Aiding and Abetting
              4.     Injunctive Relief                                                       29
              5.     Public Policy                                                             29

VI.    Milan Belans
    A.    Background and Allegations Against Belans    30
    B.    Belans' Arguments    33
    C.    Analysis    33
        1.    Primary Liability    33
        2.    Section 13    34
        3.    Injunctive Relief    35

VII.    Paul Free    35
    A.    Background and Allegations Against Free    35
    B.    Free's Arguments    37
    C.    Analysis    37
        1.    Failure to State a Claim    37
        2.    Injunction and Disgorgement    39

VII.    Scot McDonald    39
    A.    Background and Allegations Against McDonald    39
    B.    McDonald's Arguments    42
    C.    Analysis    42
        1.    Aiding and Abetting    42
        2.    Severance and Transfer    44

VIII.    Conclusion    47

# I. Introduction

This is a securities fraud case. Plaintiff, the United States Securities and Exchange Commission (SEC) is suing Delphi Corporation (Delphi) and several of its senior officers, members of its accounting and treasury staff, as well an individual employed by a third party, for their actions resulting in Delphi Corporations materially misstating its financial condition and operating results in SEC filings and in offering documents. The SEC makes claims against defendants under the following securities laws:

Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a);

Sections 10(b)5, 15 U.S.C. § 78j(b) and accompanying Rule 10b-5, 17 C.F.R. § 240.10b-5;

Sections 13(a) and 13(b)(2)(A) of the Exchange Act, 15 U.S.C. §§ 78m(8) and 78m(b)(2)(A) and accompanying Rules (Rules 12b-20, 13a-1 and 13a-13, 17 C.F.R. §§240.12b-2-, 240.13a-1 and 240.13a-13); and

Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(c)

The SEC seeks civil penalties, injunctive relief and disgorgement of profits.

Before the Court are separate motions to dismiss under Fed. R. Civ. P. 9(b) and 12(b)(6) filed by the following defendants:

- Judith Kudla
- John Blahnik
- Milan Belans
- Paul Free
- Scot McDonald[1]

For the reasons that follow, the motions will be denied.

_____

[1]In addition to dismissal, McDonald alternatively moves for severance or a transfer.

## II. Background

In approximately August of 2004, the SEC notified Delphi that it had issued a Formal Order of Investigation into matters underlying the complaint in this case. In connection with its investigation, the SEC issued subpoenas to numerous entities, including defendants.

On October 30, 2006, after about a two year investigation, the SEC filed a securities fraud complaint, running 79 pages and 136 paragraphs, naming the following defendants:

> Delphi Corporation
> JT Battenberg III
> Alan Dawes
> Paul Free
> John Blahnik
> Milan Belans
> Catherine Rozanski
> Judith Kudla
> Scot McDonald
> B.N. Bahadur
> Atul Pasricha
> Laura Marion
> Stuart Doyle
> Kevin Curry

In the Summary of Allegations portion of complaint, the SEC describes the case as follows:

> This case involves a pattern of federal securities law violations by defendant Delphi Corporation (Delphi) and certain of its senior officers, accounting staff, and treasury staff, from 2000 through 2004. During this time [defendants] engaged in one or more fraudulent accounting or disclosure schemes. As a result of these schemes, Delphi materially misstated its financial condition and operating results in filings with the Commission, in offering documents, and in other statements to investors.

Compl. at ¶ 1. As will be explained, the complaint details several different transactions

a/k/a schemes, which the SEC says violated securities laws.

On the same day of filing the complaint, the SEC filed consents to judgment as to the following defendants:

Delphi
Alan Dawes
B.N. Bahadur
Atul Pasricha
Laura Marion
Stuart Doyle
Kevin Curry

On November 8, 2007, the Court entered Final Judgments as to these defendants.

Thereafter, the remaining defendants, with the exception of Catherine Rosanski and J.T. Battenburg III,[2] filed separate motions to dismiss.

Because each defendant filed a separate motion, to which the SEC separately responded, the Court will separately consider each motion.

### III.  Legal Standards

The following legal standards apply to all of the motions.

### A.  Pleading Standards

In facing a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) "[t]he court must construe the complaint in the light most favorable to the plaintiff, accept all the factual allegations as true, and determine whether the plaintiff can prove a set of facts in support of its claims that would entitle it to relief."  Bovee v. Coopers & Lybrand C.P.A., 272 F.3d 356, 360 (6th Cir. 2001).  As the Supreme Court held in Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955 (2007), a complaint must be

---

[2]Rozanski and Battenburg filed separate Answers and Affirmative Defenses on March 12, 2007.

dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted if the complaint does not plead "enough facts to state a claim to relief that is plausible on its face." Id. at 1974 (rejecting the traditional Rule 12(b)(6) standard set forth in Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). Under Rule 12(b)(6), "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp., 127 S.Ct. at 1964-65 (citations omitted); Association of Cleveland Fire Fighters v. City of Cleveland, 502 F.3d 545, 548 (6th Cir. 2007). Even though a complaint need not contain "detailed" factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atlantic Corp., 127 S.Ct. at 1965 (citations omitted).

Notwithstanding the liberal standard required under Rule 12(b)(6), when fraud is alleged Fed. R. Civ. P. 9(b) requires that the allegations "be stated with particularity." The particularity requirement of Rule 9(b) serves three purposes:

> 1) it ensures that allegations are specific enough to inform a defendant of the act of which the plaintiff complains, and to enable him to prepare an effective response and defense; 2) it eliminates those complaints filed as a pretext for the discovery of unknown wrongs-a 9(b) claimant must know what his claim is when he files; and 3) it seeks to protect defendant from unfounded charges of wrongdoing which injure their reputations and goodwill.

Bovee, 272 F.3d 356 at 361-62 (6th Cir. 2001)(quoting Vennittilli v. Primerica, Inc., 943 F. Supp. 793, 798 (E.D. Mich.1996)). Consequently, "[c]onclusory allegations that a defendant's conduct was fraudulent are insufficient." In re Air Crash Disaster at Detroit Metro. Airport v. Northwest Airlines, Inc., 737 F. Supp. 406, 407 (E.D. Mich.1989);

4

Bovee, 272 F.3d at 361.  "Instead, the complaint must describe the conduct that allegedly constitutes the fraud with some specificity."  Id.  "Plaintiffs may not simply rely on the proposition that Defendants must have known or should have known of, and participated in, the fraud."  Bovee, 272 F.3d at 361.

## B.  Securities Laws/Rules

## 1.  Section 10(b) and Rule 10b-5 and Section 17(a) (ANTI-FRAUD VIOLATIONS)

### a.  The Statute and Rules

Section 10(b), 15 U.S.C. § 78j(b), provides that it is unlawful:

To use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b-5, 17 C.F.R. § 240.10b-5, states that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

Section 17(a), 15 U.S.C. § 77q(a) provides:

It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly-

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

15 U.S.C. § 77q(a).

The elements of an action for securities fraud under Section 10(b) of the Exchange Act (and Rule 10b-5 thereunder) and Section 17(a)(1) of the Securities Act are substantially the same under the Supreme Court's precedents. See Aaron v. SEC, 446 U.S. 680, 695 (1980); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 196 (1976). The one difference being that section 17(a) requires pleading fraud "in the offer or sale of any securities," not simply "in connection with the purchase or sale" of a security as required by section 10b.

### b. The Elements - including Scienter[3]

In order to state a claim for violation of Section 10(b), Rule 10b-5, and Section 17(a), a plaintiff must allege: 1) a misrepresentation or omission, 2) of a material fact, 3) made with scienter, 4) justifiably relied on by plaintiff, and 5) proximately causing injury to plaintiff. Helwig v. Vencor, Inc., 251 F.3d 540, 554 (6th Cir. 2001) (en banc) (citing Aschinger v. Columbus Showcase Co., 934 F.2d 1402, 1409 (6th Cir .1991)); In re Comshare, Inc. Securities Litigation, 183 F.3d 542, 548 (6th Cir. 1999); In re Federal-Mogul Corp. Securities Litigation, 166 F. Supp. 2d 559, 562 (E.D. Mich. 2001).

"At the pleading stage, a plaintiff satisfies the materiality requirement ... by

---

[3]Although the requirement of pleading scienter is high, the SEC is not subject to the stringent pleading requirements of a private litigant under the PLSRA.

alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." Ganino v. Citizens Utility Co., 228 F.3d 154, 161 (2d Cir. 2000); Helwig v. Vencor, Inc., 251 F.3d 540, 563 (6th Cir. 2001). "[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)(footnote omitted).

As to scienter, it is defined as a "mental state embracing intent to deceive, manipulate or defraud." In re Comshare, 183 F.3d at 548 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976)) (quotation marks omitted). Liability under section 17(a)(1), section 10(b), and Rule 10b-5 cannot exist in the absence of scienter on the part of the defendant. Aaron v. SEC, 446 U.S. 680, 691, 697 (1980). "Scienter" refers to a mental state that embraces "an intent on the part of the defendant to deceive, manipulate, or defraud." Id. at 686 & n. 5. "[C]onduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities" is manipulative. Ernst & Ernst, 425 U.S. at 199. Because scienter is a mental state, proving its existence with direct evidence is often difficult. Scienter may be established by the trier of fact, however, by drawing inferences from the facts of the case, including the defendant's conduct and knowledge. See, e.g., Meadows v. SEC, 119 F.3d 1219, 1226-27 (5th Cir.1997). In the Sixth Circuit, the requisite scienter may also be established by showing that the defendant acted with recklessness-"highly unreasonable conduct which is an extreme departure from the standards of ordinary care." SEC v. George, 426 F.3d 786, 792 (2005) (quoting Mansbach v. Prescott, Ball &

Turben, 598 F.2d 1017, 1025 (6th Cir.1979)); accord SEC v. Blavin, 760 F.2d 706, 711 (6th Cir.1985).

## 2. Section 13(a) and Rules 12b-20 and 13a-1 (REPORTING VIOLATIONS)

Section 13(a) of the Exchange Act and SEC Rules 12b-20, 17 C.F.R. § 240.12b-20, and 13a-1, 17 C.F.R. § 240.13a-1, promulgated thereunder, require issuers of registered securities to file various reports relative to those securities and to supplement them as necessary to ensure that they are not misleading.

Section 13(a) states in relevant part:

Every issuer of a security registered pursuant to section 78l of this title shall file with the Commission, in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security-

(1) such information and documents (and such copies thereof) as the Commission shall require to keep reasonably current the information and documents required to be included in or filed with an application or registration statement filed pursuant to section 78l of this title, except that the Commission may not require the filing of any material contract wholly executed before July 1, 1962.

(2) such annual reports (and such copies thereof), certified if required by the rules and regulations of the Commission by independent public accountants, and such quarterly reports (and such copies thereof), as the Commission may prescribe.

Rule 12b-20 states:

Every issuer having securities registered ... shall file an annual report on the appropriate form authorized or prescribed therefor for each fiscal year after the last full fiscal year for which financial statements were filed in its registration statement. Annual reports shall be filed within the period specified in the appropriate form.

Rule 13a-1 states:

Every issuer having securities registered ... shall file an annual report on the appropriate form authorized or prescribed therefor for each fiscal year after the

last full fiscal year for which financial statements were filed in its registration statement. Annual reports shall be filed within the period specified in the appropriate form.

### 3.  Section 13(b) (BOOKS AND RECORDS VIOLATIONS)

Section 13(b)(2)(A) requires that issuers of securities subject to the Exchange Act's reporting provisions "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer."  15 U.S.C. § 75m(b)(2)(A).  Consistent with that requirement, Rule 13b2-1 prohibits one from falsifying any corporate book, record or account subject to the provisions of the Exchange Act:

> No person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to Section 13(b)(2)(A) of the Securities Exchange Act.

17 C.F.R. § 240.13b2-1.  Similarly, Section 13(b)(5) of the Securities Exchange Act, provides that "[n]o person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account" that one is required to prepare under the Exchange Act.

Unlike Section 10(b) and Rule 10b-5 claims, no showing of scienter is required to establish a violation of Rule 13b2-1.  SEC v. McNulty, 137 F.3d 732, 740-741 (2d Cir.1998); SEC v. Lowy, 2003 U.S. Dist. Lexis 8918, *68-69 (E.D.N.Y.2003).  A plaintiff must, however, show that the defendant acted unreasonably.  Lowy, 2003 U.S. Dist. Lexis 8918, at *69.

### 4.  Section 20(e) (AIDING AND ABETTING)[4]

---

[4]Private causes of action for aiding and abetting under Section 10(b) and Rule 10b-5 are not permitted.  See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164 (1994). However, because the SEC is not considered a

Under Section 20(e) of the Exchange Act, "a person may be held as an aider and abettor only if some other party has committed a securities law violation, if the accused party had a general awareness that his role was part of an overall activity that is improper, and if the accused aider-abettor knowingly and substantially assisted the violation." SEC v. Coffey, 493 F.2d 1304, 1316 (6th Cir.1974). To determine whether an alleged aider and abettor had a "general awareness" that his activity was improper, the Court must consider the surrounding circumstances and expectations of the parties. SEC v. Washington County Utility District, 676 F.2d 218, 226 (6th Cir.1982). "[T]he defendant must have knowledge of the wrongful character of the activity, not merely knowledge of the activity which led to the wrong." Vidosh v. Holsapple, 1987 WL 273164, *17 (E.D. Mich. 1987).

## IV.  Judith Kudla

### A.  Background and Allegations Against Kudla

Kudla has been a certified public accountant since 1984. She served in various positions at Delphi from 1998 until April 2002, when she was separated from the company. She served as Director of Finance in Delphi's Information Technology (IT) department from June 1999 to April 2002 and was responsible for providing advice on Generally Accepted Accounting Principles (GAAP) with respect to IT department transactions.

Kudla is alleged to have violated the securities laws with respect to her actions regarding the transaction identified in the complaint as the "IT Payment Scheme."

---

private party, it is entitled to bring aiding and abetting claims. 15 U.S.C. § 78t(e).

According to the complaint, in the fourth quarter of 2001, Delphi improperly recorded a $20 million payment from Electronic Data Systems (EDS), a Texas IT company, as fourth quarter income despite the fact that Delphi knew it was required to pay the $20 million back with interest. EDS agreed to pay Delphi the $20 million in return for Delphi entering into a new IT contract (hereinafter called the New IT Contract) with EDS. At the time of the agreement, Delphi and EDS agreed that Delphi would repay the $20 million to EDS over five years in monthly payments of $333,333.33. They also agreed that Delphi would pay interest on the $20 million, involving accelerated payments on other EDS service invoices and using a third-party supplier program. See Compl. at ¶71-72.

The SEC alleges the following as to Kudla's involvement in the IT Payment Scheme:

Kudla was an active participant in the scheme to mischaracterize the $20 million lump sum payment as income in the fourth quarter of 2001. Compl. at ¶ 86. She actively participated in meetings and discussions leading to the signing of the New IT Contract and the signing of a false and misleading side letter concerning the $20 million payment. Id. She also knew that Delphi agreed to repay the $20 million to EDS. Compl. at ¶ 75. Kudla knew or was reckless in not knowing that, because the $20 million was refundable, it would contravene GAAP to record the $20 million as an immediate reduction of IT expense instead of a Delphi liability to EDS. Id. The misstatement that resulted from Kudla's misconduct were reflected in Delphi's From 10-K for 2001 and also incorporated by reference into offering documents filed by Delphi in connection with its 2003 notes and preferred securities offerings. Id.

Kudla's involvement in the IT Payment Scheme continued into 2002.  Kudla devised a plan for documenting, but disguising, Delphi's repayment obligation in order to alleviate EDS's repayment concerns.  Id. at ¶ 83.  In early 2002, after discussion, Kudla approved a solution to EDS' concerns by entering false "work orders."  Id. at ¶ 84. Under the terms of the New IT Contract, Delphi would instruct EDS to perform work by negotiating "work orders" which would describe the nature of work to be performed and the amount Delphi would pay for the work.  Delphi and EDS, under Kudla's plan, entered into work orders purported to be for $20 million worth of "administrative services."  Id.  In return for these services, Delphi would pay EDS $20 million over five years in the amount of $333,333,33 per month.  Id.  In fact, the SEC says EDS did not provide any administrative services under the New IT Contract.  One or more of the work orders was authorized for Delphi by Kudla.  Id.  Kudla knew or was reckless in not knowing that the true purpose of the work orders was to facilitate monthly repayments of the $20 million.  Id.

### B.  Kudla's Arguments

Kudla says that the SEC has failed to plead its claims against her with the particularity required by Rule 9(b).  She also says that the SEC has not plead the requisite intent for its claims under Section 10(b), Rule 10b-5 and Section 17(a)(1).  In other words, she says that the SEC has not plead scienter.  Kudla also argues that the SEC fails to allege the essential "who" "what" "where" "when" and "why" in its allegations of fraud.  Kudla further argues that several of the SEC's claims fail to state a claim upon which relief can be granted, including a claim for violation of section 17(a), which includes an allegation of wrongdoing by Kudla after she left Delphi.

**C. Analysis**

**1. Pleading Requirements**

Kudla's arguments as to the SEC's pleading requirements are without merit. As to scienter, the SEC alleges that Kudla, a CPA, was responsible for accounting in the division that was negotiating the $20 million payment and knew that the amount would be paid back to EDS or was reckless in not knowing that it would violate GAAP to report it as income. While the SEC does not allege that Kudla knew at the time she approved the work orders that they were not for legitimate services, the inference, based on her role at Delphi, at least raises a question of recklessness. These are not generalized allegations; rather, they are specific allegations as to Kudla's knowledge or recklessness and are sufficient to meet the requirements of Rule 9(b) and show scienter.

As to the details of the IT Payment Scheme and particularity requirements, of which Kudla is alleged to have been involved, the SEC describes the scheme in great detail. The SEC identifies Delphi's Form 10-K for 2001 as filed with the SEC on or about February 12, 2002, as well as subsequent 2003 offering documents, as the times and places at which the defendants, including Kudla, materially overstated Delphi's net income and earnings per share. Compl. at ¶ 5, 86. The SEC also identifies the dates or time frames of the key documents, describes the documents, Kudla's role in the scheme. Compl. at ¶ 71, 79, 80, 82-84, 86). These allegations give Kudla fair notice of the substance of the claims against her.

**2. Failure to State a Claim**

Kudla argues that several of the SEC's claims fail to state a claim upon which relief may be granted under Rule 12(b)(6).

### a. Violation of Section 17(a)

Kudla says that the SEC's claim that Kudla committed a direct violation of section 17(a) fails to state a claim because the allegation against her is "factually impossible." The Complaint says that "in at least 2003 . . . Kudla in the offer or sale of securities ..." made fraudulent statements. Compl. at ¶ 104. However, Kudla was terminated by Delphi in April 2002. This argument is unavailing. As the SEC points out, it is irrelevant that Kudla was not at Delphi in 2003 because it is alleged that she created false figures knowing that they would be disseminated to investors in Delphi's future financial statements.

Kudla also argues that the claim fails because the SEC does not make any factual allegations that she directly committed fraud "in the offer or sale of securities." Essentially, she says that the omissions attributed to her involve his internal communications, rather than public statements to investors. As such, she contends that the SEC has not alleged that his misrepresentations were made "in connection with the purchase or sale of securities." This argument too fails. In Anixter v. Home-Stake Production Co., 77 F.3d 1215, 1226 (10th Cir.1996), the Court of Appeals for the Tenth Circuit that a person may be held liable for non-public misrepresentations or omissions if that person could anticipate that the misrepresentation or omission would eventually reach investors. In Anixter, the Tenth Circuit explained that "[t]here is no requirement that the alleged violator directly communicate misrepresentations to [investors] for primary liability to attach ... [so long as there is] a showing that he knew or should have

known that his representation would be communicated to investors." Id., citing SEC v.

Holschuh, 694 F.2d 130, 142 (7th Cir. 1982).  In SEC v. Nacchio, 438 F. Supp. 2d 1266,

1281 (D. Col.  2006), the district court, following Anixter, held that although the

defendant employee "did not directly participate in the preparation of misleading

financial statements," but nevertheless had acted "in connection with" the purchase or

sale of securities where the employee created false financial numbers and failed to tell

the company's auditors or accountants.  The court reasoned that the employee

"anticipated and intended that his concealment . . . would result in [the company]

misleading investors." Id.  Other courts, including the United States Supreme Court,

have taken a similar broad view of the "in connection with" requirement.  See In re

Ames Dept. Stores, Inc. Stock Litigation, 991 F.2d 953, 962-67 (2d Cir. 1993) ("in

connection with" requirement satisfied because false financial information disseminated

into the marketplace though press releases, news articles, and public filings);

Superintendent of Ins. of Bankers Life & Cas. Co., 404 U.S. 6, 11-13 (1971) ("deceptive

practices touching [the] sale of securities" satisfies the in connection requirement; SEC

v. Zandfor, 535 U.S. 813, 822 ("it is enough that the scheme to defraud and the sale of

securities coincide.").  Here, the fact that investors were mislead after Kudla's conduct

giving rise to the false statements is sufficient inasmuch as the SEC alleged that Kudla

essentially anticipated or intended that later concealment would occur.  In other words,

the SEC alleges that Kudla acted to create income numbers with the purpose that they

be reported to the public in company filings and public statements.  The SEC also

argues that Kudla, as a CPA and finance director, knew that financial statements are

routinely intended in securities offerings and public documents beyond a company's

Form 10-K.  Overall, the SEC has sufficiently allege a section 17(a) claim in terms of the "in connection with" requirement.

Finally, Kudla says that the section 17(a) claim fails because the SEC does not allege that Kudla obtained any financial benefit as a result of the alleged fraudulent conduct.  This argument also fails.  Section 17(a)(2) does not require that the person who makes the false or misleading statement in an offering documents need to obtain a financial benefit.  Rather, it is sufficient that Kudla's actions resulted in a benefit to Delphi's efforts to raise money through its public offerings.

### b.  Violation of 10(b) and Rule 10b-5

Kudla says that the SEC has failed to state a claim against her for violations of Section 10(b) and Rule 10b-5 because the SEC has not alleged that she made any statements to the public or was involved in drafting the Ford 10-K for 2001 or the offering documents filed by Delphi with its 2003 nots and preferred securities offerings. The SEC says that although Kudla did not sign these documents, she is responsible for them because she signed key documents and took actions integral to the inflation of Delphi's net income numbers, with the purpose that those materially misstated numbers be included in the company's public filings.

The Court agrees with the SEC.  The Sixth Circuit has held that a person is not primarily liable for failure to disclose a material fact unless he had a duty to disclose that fact.  <u>SEC v. Coffey</u>, 493 F.2d at 1304,1315 (6th Cir. 1974).  The Sixth Circuit has said that if a defendant has "direct contacts" with the "other side," then they can be held primarily liable under Section 10(b).  <u>Id</u>.  The "other side" need not be investors, but may be entities involved in providing information to investors.  <u>Id</u>.  The Sixth Circuit has

described "direct contacts" as follows:

> Direct contacts require neither physical presence nor face to face conversation. A person undertaking to furnish information which is misleading because of a failure to disclose a material fact is a primary participant. Conversely, a person who does not undertake to furnish any information, and who is not aware of what information has been furnished, is under no duty to disclose material information in his possession.

SEC v. Washington County Utility Dist., 676 F.2d 218, 223 (6th Cir. 1982).

Here, the SEC alleges that Kudla furnished materially false information about Delphi's financial conditions for disclosure to Delphi's investors. She is alleged to have been responsible fro GAAP accounting in Delphi's IT department, yet she participated in a scheme to mischaracterize the $20 million payment as income. In other words, the documents Kudla created are alleged to have been used in the preparation of misstatements and omissions to investors. The Court finds this conduct is sufficient to allege a primary violation of 10(b).

### c. Aiding and Abetting Claims

Kudla argues that the SEC's aiding and abetting claim for violations of 10(b) and books and records violations (Section 13). Section 20(e) of the Exchange Act provides that any person who "knowingly" provides "substantial assistance" to another person's violation of the Exchange Act shall be liable to the same extent as the person to whom such assistance is provided. The Sixth Circuit stated has set forth three elements for an aiding and abetting claim under Section 20(e):

> a person may be held as an aider and abettor only if some other party has committed a securities law violation, if the accused party had general awareness that his role was part of an overall activity that is improper, and if the accused aider-abettor knowingly and substantially assisted the violation.

SEC v. Washington County Utility Dist., 676 F.2d 218, 224 (6th Cir. 1982).

17

Here, for the same reasons that the SEC has alleged a primary violation against Kudla, so too has it alleged aiding and abetting liability.  Again, the SEC alleged that Kudla was responsible for accounting in the division that was negotiating the $20 million payment, that she knew the $20 million would be paid back to EDS, and that she knew or was reckless in not knowing that because the $20 million was refundable, it would violate GAAP to record it as income.  The SEC also alleges that Kudla approved the false work orders.  Although the work orders are not tied to Delphi's misstatements, they were a mechanism for Delphi to pay the $20 million without making it obvious that it was repaying EDS.  Thus, the work orders were essential to the scheme to falsely state Delphi's 2001 net income in Delphi's Form 10-K, including the 2003 offering documents.

### d.  Section 13(b)(5) and Rule 13b2-1

As noted above, section 13(b)(5), 15 U.S.C. § 78m(b)(5) provides that "[n]o personal shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account."  The accompanying Rule is Rule 13b2-1.  As one court put it, "the overarching purpose of the Rule [Rule 13b2-1] and of the Securities Act generally, is to force publicly traded companies to maintain accurate records."  SEC v. Jorissen, 2007 WL 135959, * 7 (E.D. Mich. Jan. 3, 2007).  Not only is the SEC not required to plead scienter, SEC v. McNulty, 137 F.3d 732, 741 (2d Cir. 1998), but claims under § 13 are not subject to Rule 9(b)'s requirements, SEC v. Stansbury Holdings Corp., 2007 WL 552248 at *5 (D. Colo/ Feb. 20, 2007).

Kudla says that the SEC has not identified the specific internal controls.  The Court disagrees.  The SEC identifies Kudla's duties with respect to Delphi's internal

18

controls-she was the finance director of the IT Department and responsible for providing advice on GAAP. The SEC alleges that Kudla engaged in a scheme to violate GAAP by, inter alia, creating false documents. This is sufficient to make out a claim that Kudla circumvented Delphi's internal controls and created false books and records.

### 3. Other Arguments

Kudla also advances other arguments in support of dismissal, relating to the statute of limitations and the SEC's request for injunctive relief and disgorgement.

### a. Statute of Limitations

Kudla says that the applicable five year statute of limitations under 28 U.S.C. 2462 bars any claims for civil penalties that occurred prior to October 30, 2001. In response, the SEC says that the alleged misstatements at issue regarding Kudla appeared in Delphi's Form 10-K filed in 2002 and in 2003 offering documents, both of which are beyond the alleged statute of limitations. The SEC also says that the reference in the complaint at paragraph 83 to "early 2001" is a topographical error. In light of the SEC's representations, this argument need not be considered.

### b. Injunctive Relief and Disgorgement

Finally, Kudla says that the SEC has failed to state a claim for permanent injunctive relief and has not alleged facts or compelling circumstances justifying the necessity of an injunction. She also says that the SEC has not plead any facts supporting its disgorgement claim. Neither argument is persuasive. At best, they are premature. As one court put it with respect to injunctive relief:

> The complaint in the light most favorable to plaintiff, the allegations are sufficient to indicate violations of the Act. In view of the serious allegations of

illegal activity committed in the past, the contention of the defendants that plaintiff's complaint fails to state a cause of action for injunctive relief must be rejected. It is clear that the primary purpose of injunctive relief is to deter violators of the securities law from committing future violations. However, an inference may arise from past illegal conduct that future violations of the law may occur. "The fact that illegal conduct has ceased does not foreclose injunctive relief." Securities Exchange Commission v. Koracorp Industries, Inc., 575 F.2d at 698. More importantly, it must be emphasized that the defendants are urging the inappropriateness of injunctive relief in a motion to dismiss and not after a full trial on the merits. While this Court recognizes that the decision of Aaron v. Securities Exchange Commission requires the SEC to establish the existence of a threatened wrong before the imposition of injunctive relief is appropriate, the pleadings in this complaint are sufficient to withstand defendants' motions to dismiss. This Court must await further proof before it can determine whether the SEC has established that there is a reasonable likelihood that the alleged wrongs of the defendants will be repeated. . .

SEC v. Tiffany Ind., Inc., 535 F. Supp. 1160, 1165 (E.D. Mo. 1982) (citations omitted).

As to the disgorgement request, it too is untimely given that none of the defendants have been found liable for any securities violation. See SEC v. Buntrock, 2004 WL 1179423 at * 3 (N.D. Ill. May 25, 2004) (holding request to dismiss disgorgement remedy premature at pleading stage).

### V. John Blahnik

### A. Background and Allegations Against Blahnik

Blahnik was a senior officer at Delphi. During the relevant time, he served as Treasurer and then Vice President of Treasury, Mergers and Acquisitions of Delphi. He reported to defendant Alan Dawes, who was Chief Financial Officer of Delphi. Compl. at ¶ 18, 20. He is not a CPA, but his position required a sophisticated understanding of financial matters. In his positions, he oversaw the preparation of Delphi earnings releases and analyst and rating agency presentations that incorporated information concerning GAAP and non-GAAP measures of Delphi's cash flow and liquidity. Id.

From January 2000 to August 2001, Blahnik supervised defendant Milan Belans, a CPA, who worked in Delphi's treasury department as Director fo Capital Planning and Pension Analysis. Compl. at ¶ 21.

The SEC alleges that Blahnik was involved in activities which resulted in false statements in Delphis 2000 Form 10-K, 2001 and 2003 offering documents, incorporating the 2000 Form 10-K, and Forms 8-K filed in 2002-2004.

The SEC alleges that Blahnik was involved in two schemes, described as "Inventory Transactions" and "Undisclosed Accounts Receivable Factoring," which forms the basis for its claims against him. As to the Inventory Transactions scheme, the SEC alleges that near the end of 2000, Delphi entered into two transactions through which it (1) purported to sell approximately $200 million of precious metal inventory to a bank ("Bank") and (2) approximately $70 million of automotive generator cores and batteries to a company called BBK, Ltd. ("BBK"), a Michigan consulting company controlled by defendant B.N. Bahadur. Compl. at ¶ 2, 45. Delphi simultaneously agreed that it would repurchase the same inventory from the same parties in the first quarter of 2001. Id. at ¶ 45. Delphi entered into these transactions under the direction of senior officers, including Blahnik. Id. at ¶¶ 48, 50, 54, 59, 60, 61, 63, 66, 67, 69. The SEC alleges that Blahnik signed the agreements with the Bank and approved an invoice through which Delphi repurchased the inventory from BBK. Id. at ¶ 52, 61, 66.[5] The

---

[5]The SEC says it inadvertently failed to allege that Blahnik also signed the agreement to purchase inventory from BBK. The SEC says that while it believes the Complaint as it stands sufficiently alleges Blahnik's involvement in the Inventory Schemes, it asks for leave to amend the Complaint to make this specific allegation should the Court deem it necessary.

SEC alleges that these transactions were sham inventory reductions, with no legitimate business purpose. The SEC says that in Exchange for paying more than $4 million of Delphi's money, Blahnik and other defendants made it appear that Delphi had generated $200 million in operating cash flow, $81 million in increases to net income and material year-end reductions in inventory. Compl. at ¶¶ 45, 48, 52, 53, 62. The SEC says that the only economic impact of the transactions was to reduce the cash in Delphi's coffers by $4 million, while fooling investors into believing that, through its "aggressive inventory management," "Delphi had met or exceeded its financial forecasts." Id. at ¶ 68.

With respect to the precious metals transaction with the Bank, the SEC says that Delphi's year-end cash flow and income forecasts for 2000 had been based in part on a planned sale of $200 million of precious metals to General Motors. When this sale did not take place, the SEC alleges that Blahnik and others directed defendant Belans to come up with a way to remedy the resultant shortfall from Delphi's financial targets. Compl. at ¶ 48. Blahnik approved the plan for Delphi to refinance the inventory, but to mischaracterize the proceeds from the financing as if they were proceeds from the sale of the metals. Id. at ¶¶ 46, 48, 50, 54. Blahnik approved the plan, knowing that Delphi would be paying a significant fee to the Bank to "purchase" the metals and that the sole purpose of the plan was to give the false impression that Delphi had sold the metals and had generated year-end genuine operating cash flow and income. Id. at ¶¶ 46, 48, 50, 52, 54. In late December 2000, Delphi entered into a sales agreement with the Bank, under which it "sold" the metals to the Bank for approximately $199 million. Id. at ¶¶ 46, 52. Delphi also entered a purportedly separate forward agreement with the Bank, under

22

which it agreed to buy the metals back from the Bank in January 2001 for approximately $202.5 million.  <u>Id</u>.  Even though the sales agreement characterized the transaction as a sale, the SEC alleges that Blahnik knew the transaction was an "Off-balance sheet financing of [metals] inventory" and that the forward price was simply "the price received under [the sales agreement], plus the $2 million transaction fee [paid to the Bank] plus the [Bank's] interest carry cost.  <u>Id</u>. at ¶¶ 48, 54.  As a result, the SEC alleged that Delphi improperly recognized $54 million in net income and improperly boosted its cash flow from operations by approximately $200 million.  <u>Id</u>. at ¶ 48.

With respect to the cores and batteries transaction with BBK, the SEC alleges that also in December 2000, Blahnik directed defendant Belans to negotiate a structured finance transaction that would help Delphi reduce its inventories of generator cores and automotive batteries and generate operating cash flow and net income.  Compl. at ¶ 59, 66.  The plan Blahnik approved was for Delphi to finance the cores and batteries inventory, but to mischaracterize the proceeds from the financing as if they were proceeds from a sale.  <u>Id</u>. at ¶¶ 55-56, 59.  In late December 2000, Blahnik signed an agreement though which Delphi purported to sell $70 million of cores and batteries to BBK.  Shortly before signing the agreement, Blahnik participated in a conference call with defendants Free and Belans where they discussed the agreement and the fact that BBK was unable to come up with the funds necessary to purchase the inventory.  Compl. at ¶ 59.  Nevertheless, because the agreement was important to Delphi's plan to over report income, Blahnik, along with Free, directed Belans to go forward with the transaction.  <u>Id</u>.

In 2001, the SEC alleges that Belans, with Blahnik and Free's knowledge and

approval, came up with an alternative plan that resulted in Delphi using its own funds to finance BBK's purported purchase of the cores and batteries, while making it appear that BBK had paid for the inventory. Compl. at ¶ 60. Belans enrolled BBK in a third party supplier financing program. Delphi the arranged with defendant Bahadur to have BBK issue an invoice to Delphi for $70,840,214.28 and, with Blahnik and Free's approval, the invoice was submitted to the third party financier for payment. Id. at ¶ 61. The amount was calculated so that after the third party supplier took its fee, BBK would receive the net proceeds of $70,350,000 ($70 million plus 0.5%). Id. Upon receiving these monies, BBK immediately paid Delphi $70 million as payment for its December 2000 purchase of the cores and batteries. BBK retained the balance as its fee. Id. at ¶ 62. When the transactions was complete, the SEC alleges that the net effect was that Delphi, at a cost of $900,000, had manufactured a gain to income of $27 million and had made it appear that Delphi had reduced its year-end inventory levels. Id. All of this despite no inventory ever left Delphi's premises. Id.

As to the Undisclosed Receivable Factoring scheme, the SEC alleges that from at least 2004 to 2004 Blahnik participated in a scheme to avoid disclosing the full extent of Delphi;'s European Accounts Receivable Factoring Program. Compl. at ¶¶ 89, 92. By causing Delphi to hide a material portion of its European factoring, Blahnik, who oversaw Delphi's preparation of earnings releases and analyst and rating agency presentations, was able to materially misrepresent Delphi's Street Net Liquidity by up to $300 million. Id. at ¶¶ 20, 89. The SEC further alleges that in at least one period, Blahnik further manipulated Delphi's disclosure of the factoring in order to materially overstate Delphi's Street Operating Cash Flow by an additional $30 million. Id. at ¶ 92.

The SEC says that the undisclosed factoring was described by some individuals at Delphi as the "secret" factoring. <u>Id</u>. Under the direction of defendant Dawes and Blahnik, during the period 1999 through 2002, only factoring exceeding abas level of $300 million was disclosed by Delphi. <u>Id</u>. By late 2002 or early 2003, Dawes and Blahnik were advised that it was improper for Delphi to exclude the secret factoring from disclosure. However, the SEC alleges that they took no action to exclude it, and in the first quarter of 2003, at Blahnik's suggestion and Dawes' knowledge, Delphi briefly and intentionally increased the hidden factoring and decreased disclosed factoring, by $30 million. <u>Id</u>. In so doing, Delphi was able to understate its incremental period-to-period change in accounts receivable factoring and thus cause an automatic $30 million, or approximately20% overstatement, of reported Street Operating Cash Flow in the quarter. <u>Id</u>. This overstatement was included in Delphi's earnings release, which was furnished to the SEC on Form 8-K. <u>Id</u>.

In 2003, discussions continued with Dawes and Blahnik about disclosure of the factoring. Dawes determined that disclosure should be made, but in a way that would not be obvious to rating agencies. Compl. at 93. If disclosure was immediate, that would result in decreasing Delphi's Street Net Liquidity by $300 million. The SEC alleges that Dawes and Blahnik concluded that a disclosure of only $35 million of factoring per quarter would go unnoticed. <u>Id</u>. Accordingly, Dawes approved a plan to have the factoring "bled in" over time. <u>Id</u>. The first factoring disclosure of $35 million took place in the first quarter of 2004. By October 2004, Delphi had incrementally moved over $105 million of the secret factoring into disclosed factoring, with $195 million of the factoring remaining undisclosed.

The SEC alleges that due to Blahnik's failure to disclose the improper secret factoring, the net effect was to overstate Delphi's Street Net Liquidity.  Compl. at ¶ 95.  Specifically, the SEC alleges that from the fourth quarter of 2002 to the fourth quarter of 2004, Delphi materially overstated its Street Net Liquidity in amounts ranging from $195 million to $300 million and by percentages ranging from 7% to 11%.  Id.  These misstatements were reflected in Delphi's earnings release for the period ending December 31, 2002, as furnished to the SEC on a Form 8-K, filed January 17, 2003, and in presentations made to Delphi investors and financial analysts in connection with Delphi's earnings releases for the periods ending December 31, 2002, March 31, 2003, June 30, 2003, September 30, 2003, December 31, 2003, March 31, 2004, September 30, 2004, and December 31, 2004.  Id.

The SEC also says that Blahnik materially overstated Delphi's Street Operating Cash Flow by $30 million or approximately 20% for the period ended March 31, 2003.  Compl. at ¶ 96.  This overstatement, the SEC alleges, was reflected in Delphi's earnings release for the period ending March 31, 2003, as furnished to the SEC on a Form 8-K, filed April 16, 2003, and in related presentations to Delphi investors and financial analysts.  Id.  On June 9, 2005, Delphi issued a Form 8-K in which it acknowledged that it did not accurately disclose to credit rating agencies or analysts "the amount of sales of accounts receivable or factoring arrangements from the date of its separation from GM until year-end 2004."  Id. at ¶ 97.

### B.  Blahnik's Arguments

Blahnik says that (1) the SEC has failed to state a claim against him for primarily violations of § 10(b) and §17(a), (2) the SEC has failed to allege that Blahnik made a

misstatement "in connection with the purchase or sale" of securities, (3) the SEC fails to allege with particularity primary violations of § 13(b)(5) and Rule 13 or that Blahnik acted as an aider and abettor, (4) the SEC fails to plead facts supporting injunctive relief, and (5) this enforcement action against him violates public policy.

### C. Analysis

#### 1. Primary Violations - 10(b) and 17(a)

The SEC argues that although Blahnik did not sign the allegedly false SEC documents, he is nevertheless responsible for them because he signed key documents and took actions integral to the inflation of operating cash flow and net income numbers with the intended purpose that those materially misstated figures would find there way and be included in Delphi's public filings. Blahnik's argument is the same as the one advanced, and rejected above, with respect to Kudla. The fact that Blahnik did not have face to face interaction with investors or personally sign the SEC filings does not preclude a finding of primary liability. Here, the SEC has alleged that Blahnik undertook to furnish materially false information about Delphi's financial condition for disclosure to Delphi's investors. All of his actions, set forth above, the SEC alleges resulted in false or misleading SEC public filings. As the SEC explains:

> Blahnik directed Belans to enter financially-irrational transactions, with the sole purpose of feigning operating cash flow, inventory, and income improvements; he came up with a plan to bleed undisclosed factoring in over time to conceal from investors and rating agencies Delphi's failure to disclose it; he signed misleading documents on the inventory transactions; he omitted a material portion of Delphi's European Factoring from disclosures; and he manipulated Delphi's undisclosed European Financing; all with the purpose that the resulting false financial numbers be included in public filings, to mislead Delphi's investors about the company's true financial condition.

SEC brief at p. 31. While Blahnik vigorously argues that all of his actions were proper

and the transactions were proper, the SEC has plead otherwise. This is not a motion for summary judgment, but a motion to dismiss. The allegations, which must be presumed true, are sufficient to survive a motion to dismiss.

### 2. In Connection With Requirement

Blahnik argues that the SEC has failed to plead that his conduct was "in connection with the purchase or sale" and "in the offer or sale" of securities. This argument was also advanced by Kudla and fails for the same reasons discussed above. Again, the SEC has alleged that Blahnik took actions which he knew, or was reckless in not knowing, would result in materially false public SEC filings which would be used by the investing public.

### 3. Section 13 and Rule 13 Violations - Primary and Aiding and Abetting

Blahnik says that the SEC has failed to make out a claim against him for primary liability under § 13 and/or as an aider and abettor because the SEC has not alleged that he was the "cause" of Delphi's books and records violations or that he acted knowingly. These arguments lack merit. Blahnik does not have to be the sole cause for the alleged violations. See Jorissen, supra, 2007 WL 135959 at * 5. Here, the SEC alleges that Blahnik directed Belans to engage in the scheme and also alleges that Blahink himself signed operative agreements that mischaracterized the inventory transactions as sales. He is also alleged to have caused Delphi to misreport Street Operating Cash Flow and Net Liquidity via the improper factoring. As such, the SEC has clearly alleged he was a cause of Delphi's books and records and reporting violations. To the extent that Blahnik argues the SEC has not plead knowledge, section 13 as applied to the SEC does not require scienter. In any event, the SEC has alleged knowledge inasmuch as it alleges

Blahnik's direct participation in the schemes resulting in the books and records violations.

As to aiding and abetting, the SEC alleges that Blahnik participated and directed schemes to improperly inflate Delphi's reported cash flow and net income and feign inventory reductions. The SEC also alleges that Blahnik knew or should have known that the schemes would result in material misstatements. This is sufficient to allege aiding and abetting.

### 4. Injunctive Relief

Blahnik, like Kudla, argues that the SEC had failed to adequately plead its request for injunctive relief. For the reasons explained above, this argument is premature.

### 5. Public Policy

Blahnik argues that permitting the SEC to go forward on its claims against him violates public policy and is "an example of the overzealous regulation that is driving public companies to foreign exchanges and hurting US financial markets." While intellectually intriguing, such an argument is not a basis for dismissal under Rule 12(b) or Rule 9.

### VI. Milan Belans

### A. Background and Allegations Against Belans

Belans is alleged to have played a key role in perpetuating Delphi's frauds by participating in two schemes, (1) a scheme related to the third quarter 2000 warranty settlement, a.k.a. the "Warranty Scheme," and (2) the Inventory Transactions scheme

(discussed above). The SEC alleges that Belans used his position at Delphi to structure transactions and agreements that had the specific purpose and effect of circumventing GAAP and manipulated disclosures Delphi made in public filings with the SEC and other public document disclosures.

Belans is CPA and has been licensed in the state of Michigan since 1992. He served in various positions at Delphi, from 1998 until August 2005, when he was separated by the company. Compl. at ¶ 21. He served in Delphi's controller's office, as Director of Financial Accounting and Reporting, from August 1998 to January 2000, reporting to defendant Free. He also served in Delphi's treasury department, as Director of Capital Planning and Pension Analysis, from January 2000 to August 2001, reporting to defendant Dawes, Blahnik and defendant Pasricha. Id.

As to the Warranty Scheme, the SEC alleges that Belans played an integral role in mischaracterizing a September 2000 settlement between Delphi and GM, to make it appear it related mostly to pension and OPEB, when in fact it related to warranty. For much of 2000, Delphi and GM had been negotiating over warranty claims GM had asserted against Delphi. Compl. at ¶ 30, 35. GM asserted that Delphi owed it more than $350 million, possibly as much as $800 million, to cover alleged warranty claims for purportedly defective parts Delphi sold to GM prior to its separation from GM. Id. at ¶ 30, 24. Based on the claim, in the second quarter of 2000, Delphi increased its warranty reserves by $112 million.

Discussions of the warranty claims continued into the third quarter of 2000. The SEC alleges that Belans knew or was reckless in not knowing that engineers and financial analysts from Delphi and GM had valued the 27 warranty items at $237 million.

Id. at ¶ 42. The SEC further alleges that Belans knew or was reckless in not knowing that GM would not back down from its warranty claim. Nevertheless, Belans and his supervisor, defendant Pasricha, were tasked with finding a way to structure the transaction so that the two companies could account for the transaction "asymmetrically"– that is, that GM would account for the payment related to warranty and Delphi would account for it in some other way which would not have the impact as a $237 million warrant payment to GM. Id. at ¶ 37-38. The SEC further alleges that the purpose of the structured transaction was to manipulate Delphi's financial results. Id.

The SEC says that Belans took specific steps in furtherance of the Warranty Scheme. Belans had Delphi's actuarial consultant conduct a rough calculation of what Delphi's pension/OPEB true up payments to GM would be if the companies used certain assumptions. Id. at ¶ 38. The consultant told Belans that Delphi's pension and OPEB payments to GM could have been about $202 million higher. Based on these assumptions, which were generated in response to Belans' hypothetical question, Belans added a provision to the warranty settlement agreement that released GM from the so-called pension/OPEB claims, even though GM had never asserted such claims against Delphi and had no basis for them. Id. As planned by Belans and his superiors, the SEC says, Delphi justified its decision to account fo r $202 million of the $237 million payment to GM as if it related to pension and OPEB, when in fact it related to warranty. Id. at ¶ 38, 40. The SEC alleges that these material misstatements were reflected in Delphi's Form 10-Q for the third quarter of 2000, Form 10-K for 2000, and in various securities offering documents Delphi filed the SEC in 2001 and 2003. Id. at ¶¶ 40, 65, 70, 88.

With respect to the Inventory Scheme, discussed in detail above, Belans was directed by Blahnik and Dawes to come up with a way to finance the warranty payment for the precious metals as if it was proceeds from a sale of the metals. Belans is alleged to have come up with the plan. Compl. at ¶ 49. In so doing, he created a memorandum that falsely justified the prices as being appropriately discounted from market, based on the very large volume of metals involved in the transaction. Id. at ¶ 53. The memorandum's analysis, the SEC alleges, was contrived. Id. In fact, the SEC says that the purchase price was obtained not by looking at the metals' market value, but by taking the approximate price at which Delphi held the metals on its books. Id. The forward price was calculated by taking the $199,256.785.65 purchase price and adding $3,257,840.52 in the Bank's fees and costs. Id. The SEC also says that internal documents at Delphi make clear that Belans and others knew how these amounts were actually arrived at. The SEC alleges that one the day before Blahnik was to sign the agreement with the Bank, Belans sent Blahnik a memo stating that "th forward price is the price received under [the Purchase Agreement], plus the $2 million transaction fee, plus the interest carry cost." Id. at ¶ 54.

As to the cores and batteries transaction with BBK, also discussed above, Belans structured the purchase agreement. Compl. at ¶¶ 59, 66, 55, 58. Belans, the SEC alleges, refused to put the repurchase agreement in writing in order to hide the true nature of the agreement and obtain "true sale" accounting treatment for the transaction. Id. at ¶ 55, 56. Rather, he kept it an oral agreement.

The SEC also alleges that in 2001, when Delphi's auditors learned of the January repurchase, Belans, along with defendant Free, hid material facts concerning the

transaction from the auditor.  Id. at ¶ 63.  The auditors asked whether there had been

any pre-existing agreement with BBK to repurchase the inventory, and Belans and Free

falsely stated there was none.  Id.

### B.  Belans' Arguments

Belans argues that the complaint must be dismissed because the SEC fails (1) to

state a claim against him for primary violations of § 10(b) and § 17(a), (2) to properly  to

state a claim for violation of § 13 and allege an aiding and abetting violation, and (3)

fails to allege facts sufficient to support its claim for injunctive relief.

### C.  Analysis

### 1.  Primary Liability

Again, Belans' arguments as to primary liability are essentially the same as those

made by Kudla and Blahnik and fail for the same reasons.  That is, because he is not

alleged to have signed any SEC documents, he cannot be found primarily liable.  He,

like Kudla and Blahnik, is alleged to be responsible for the misstatements and omissions

in the identified SEC filings because he took actions integral to inflating Delphi's cash

flow numbers and net income numbers with the purposes that those numbers would be

included in the filings.  In addition, Belans is alleged to have made misrepresentations

to the auditors and failed to inform them that the financial figures he provided were

false.  The SEC specifically says:

> Belans took multiple actions with the purpose of feigning operating cash
> flow, inventory and income improvements.  He drafted agreements and
> memoranda to misrepresent the nature of the warranty and the inventory
> transactions, made an oral agreement regarding the cores and batteries
> inventory transactions and directed that information be omitted from the written
> agreement, and misrepresented the cores and batteries transaction by use of the

third party financing program. Belans knew or should have known the information he provided to auditors and for disclosure to investors was significant and misleading. Indeed, Belans created the numbers to conceal Delphi's financial condition, knowing they would be included in public filings, and he lied to Delphi's auditors to ensure the misstatements would reach investors.

SEC brief at p. 22. This is sufficient to state a claim for a primary violation of § 10(b) and for its counterpart, § 17(a).

Belans also argues that the complaint does not sufficient plead scienter. The Court disagrees. The complaint alleges that Belans was a central player in the Warranty and Inventory Transactions Schemes. The complaint alleges that Belans, using his expertise in GAAP, intentionally structured transaction that had the specific purpose of misleading investors. Compl. at ¶¶ 3, 4, 42, 49, 53, 56-61, 66, 67. These allegations are sufficient to state the requirement of scienter.

## 2. Section 13

Belans says the complaint fails to state a primary violation for § 13 and also fails to properly allege a claim for aiding and abetting in a § 13 violation. Neither argument is persuasive. The complaint contains allegations that Belans knowingly entered transactions that had the purpose of causing Delphi to misrepresent its accounting and disclosures. He is also alleged to have created a false memorandum concerning Delphi's accounting for the Bank transaction in the Inventory Transaction scheme. These allegations are sufficient to make out a claim for books and records violations.

Belans also says that the SEC has not sufficiently alleged aiding and abetting a violation of § 13. The complaint generally alleges that Belans was aware that his role was part of Delphi's mischaracterization of the 2000 settlement with GM over warranty claims. Knowing that Delphi was essentially "stuck" with the $237 million payment,

Belans helped structure the payment "asymmetrically" so that Delphi could account for the payment in a way to avoid a negative impact on its financial condition. The SEC alleges that Belans' assistance was a substantial factor in causing Delphi to mischaracterize the GM warranty settlement. The complaint also alleges that Belans participated in structuring the precious metals transaction and cores and batteries transactions to misrepresent the true nature of Delphi's financials. The SEC has sufficiently alleged that Belans aiding and abetting in books and records violations.

### 3. Injunctive Relief

Belans says that the SEC has not plead facts to support a request for injunctive relief. This argument is premature.

### VII. Paul Free

### A. Background and Allegations Against Free

Paul Free was Delphi's principal accounting officer for the period 1998 through April 2002. He actually signed Delphi's SEC filings in 2000 and 2001, which the SEC alleges Free knew, or should have known, were false. As Controller and Chief Accounting Officer of Delphi, Free prepared or oversaw the preparation of materials concerning Delphi's earnings forecasts and financial performance. Compl. at ¶ 19. He signed Delphi's 10-Q and 10-K prior to filing with the SEC. Id. He assisted in the preparation of and participated in presentations to investors and financial analysts. Id. He has been a licensed CPA in the state of Missouri since 1981. Id. He was separated by Delphi in March 2005.

The SEC alleges that Free violated the securities law by his participation in the

Warranty Scheme, detailed above with regard to Belans, and in the IT Payment Scheme, detailed above with regard to Kudla.[6] As to the Warranty Scheme, the SEC alleges that at the time he signed the SEC filings for third quarter 2000, he knew or should have known, that the warranty claims were valued at $237 million, not $35 million, and that GM had not made an OPEB and pension claims against Delphi. Id. at ¶ 42.

As to the IT Payment Scheme, the SEC alleges that Free signed Delphi's Form 10-K for 2001 which reflected Delphi's false accounting for the $20 million. The SEC says that at the time, Free knew, or was reckless in not knowing, that the $20 million would be repaid to EDS. Compl. at ¶ 75. Free knew or should have known that the agreements and side letters between Delphi and EDS were intentionally drafted for the purpose of and resulting in Delphi improperly accounting for and reporting a payment. Id. at ¶ 86. Free knew or should have known that because the $20 million was refundable, it would violate GAAP to record the $20 million as an immediate reduction of IT expense instead of a liability. Id. Free's role continued into 2002 when he signed a false work order that disguised Delphi's repayment obligation for "administrative services."

---

[6]Free requests for dismissal of the complaint to the extent that the claims are based on the third quarter warranty transaction and fourth quarter 2001 IT payment. He does not challenge (1) the false and misleading nature of the information in the filings, (2) the materiality of that false and misleading information, or (3) that Free signed the operative documents. The complaint also alleges that Free was involved with the mischaracterization of Delphi's second quarter 2002 warranty reserve and fourth quarter 2000 inventory schemes. Thus, this background only details the allegations with respect to the challenged events - the third quarter warranty transaction and the fourth quarter IT payment.

## B.  Free's Arguments

Free says that the complaint must be dismissed because (1) it fails to state a claim for primary violations of § 10(b) and § 17 and § 13, (2) the SEC is not entitled to an injunction or disgorgement.

## C.  Analysis

### 1.  Failure to State a Claim

Free's failure to state a claim arguments are that (1) the SEC's claims against him are not stated with particularity under Rule 9(b), (2) the complaint fails to plead a violation of § 10(b) or § 17(a) because the SEC has not attributed any specific misstatement to Free, (3) the SEC has not alleged scienter.  None of these arguments are persuasive.  The complaint details the nature of the violations.  It also attributes misstatements to Free - the signing of the SEC filings.  The SEC has plead in careful detail the allegations as to nature, source, and extent of the misstatements in the filings. It ties those misstatements to the various schemes in which the SEC alleges Free was actively involved, or should have been aware of.  Indeed, he is the only defendant before the Court who is alleged to have actually signed the public filings.  It is clear that this is sufficient to make out a misstatement for a securities violation.  The complaint also sufficiently alleges Free acted with the scienter required under Rule 9(b).  The allegations of recklessness are neither conclusory or general, but tied to specific allegations of Free's conduct and involvement in the schemes.

As to the claim under § 17(a), Free's argument that because the SEC has not personally alleged that he obtained any money or property lacks merit.  Section 17(a)(2)

does not require that the person alleged to have made the false or misleading statement in an offering document obtain money or property for themselves. Rather, it is sufficient that the complaint alleges that Free made false statements to investors in connection with Delphi's efforts to raise money through its public offerings. See SEC v. Youmans, 543 F. Supp. 1292, 1299 (E.D. Tenn. 1982), rev'd on other grounds, 729 F.2d 413 (6th Cir. 1984).

As to § 13 violations, the complaint is also sufficient. Free says that the SEC has not alleged that he was the cause of Delphi's books and records violations with respect to accounting for the warranty settlement and IT transaction. As noted above, Free need not be the sole cause for the violation. Free was the chief accounting officer with the alleged ultimate responsibility for Delphi's accounting books and records. The complaint alleges that he knew Delphi was recording the warranty and IT transactions in violation of GAAP. Compl. at ¶ 42, 86. The complaint also alleges that Free personally signed false representation letters to Delphi's auditor, knowing they omitted material information concerning the September 2000 warranty agreement and the December 2001 EDS transaction. Id. at ¶ 100. The Complaint also alleges that Free personally failed to inform Delphi's auditor of certain material information concerning both the warranty agreement and the $ 20 million IT payment. Id. at ¶ 101. These allegations plead a violation of Rule 13b2-2.

With regard to aiding and abetting, Free, like the other defendants, says that the SEC has not set forth the requisite elements. The Court disagrees. The allegations against Free are specific. The complaint alleges that Free knowingly and substantially assisted in the violations, by either his direct actions or actions of which he was reckless

38

in not being aware.  It also alleges that Free was responsible for preparing and
reviewing Delphi's financial statements which contained the misrepresentations.

## 2.  Injunction and Disgorgement

Again, any arguments as to the adequacy or appropriateness of the SEC's
request for injunctive relief and disgorgement is premature at this stage.

## VII.  Scot McDonald

The SEC has asserted only an aiding and abetting claim against McDonald.  As
will be explained, McDonald was not employed by Delphi, but rather by a third party,
EDS.  He moves to dismiss the claim on the grounds that it fails to state a claim.  He
alternatively moves to sever the action against him and transfer the case to the
Northern District of Texas.  Both requests will be considered.

## A.  Background and Allegations Against McDonald

McDonald was a senior accountant for EDS.  He served as EDS's Manager of
GAAP Consulting and Reporting from 1996 to 2002.  Compl. at ¶ 2, 24.   Subsequently,
he was EDS's Director of GAAP, Controller of EDS, and EDS's Chief Accounting
Officer.  Id. at ¶ 24.  McDonald has been a CPA, licensed in the state of Texas, and is
an expert in the application of GAAP.  Id. at ¶¶ 24, 87.

The SEC's claim against McDonald is based on his role in the IT Payment
Scheme.  The SEC alleges that McDonald was involved in reviewing and approving the
New IT Contract and the terms of the $20 million payment.  Compl. at ¶ 77.  In
November of 2001, McDonald was warned by another accountant at EDS that Delphi
had "questionable accounting objectives," including an intention to "record the $20

million as revenue." <u>Id</u>. at ¶ 75, 78.  This warning proved correct.  McDonald, the SEC says, also intended for EDS to defer the $20 million over the life of the New IT Contract. <u>Id</u>. at ¶¶ 76, 80.

The SEC alleges McDonald was involved in the IT Payment Scheme with respect to (1) the drafting of a side letter by Delphi,

As to the side letters, In order to obtain the approval of Delphi's auditor to account for the $20 million as immediate income, defendant Rozanski, directed Delphi to prepare a draft "side" letter that contained vague, false and misleading language concerning the payment.  <u>Id</u>. at ¶ 78.  The letter was executed by EDS.  The SEC says that McDonald approved the language.  <u>Id</u>.  On December 19, 2001, two days before the IT Contract was signed, Delphi provided EDS with multiple difference drafts of the side letter, all of which misrepresented the transaction.  <u>Id</u>. at ¶ 79.  McDonald was asked by various Delphi personnel to consider the various version of the side letter and consider Delphi's suggestion that the payment be characterized as "nonrefundable" and Delphi's request that, if possible, the letter refer to the companies "ongoing and past" relationships.  <u>Id</u>. at ¶ 80.  Both of these characterizations were inconsistent with McDonald's understanding of the true terms of the transaction, based on his discussions with other EDS personnel and his review of various documentation.  <u>Id</u>. They were consistent, however, with what the other EDS accountant told his earlier - that Delphi was looking for a way to record the $20 million asa income.  <u>Id</u>. at ¶¶ 77, 80. Despite this knowledge, the SEC says that McDonald only revised the draft documents to the extent necessary to obtain approval of EDS's auditor of EDS's desired accounting for the $20 million payment.  <u>Id</u>. at ¶ 80.

On December 19, 2001, McDonald explained to other EDS personnel in an e-mail that he had discussed the $20 million payment with EDS's outside auditor and, based on that discussion, determined that EDS could defer the $20 million "provided it is signed and dated and payment is made at the time that the [New IT Contract] is signed." Id. at ¶ 81. He further instructed that the letter "cannot refer to past services," but indicated that the term "on-going relationship" was "alright." Id. The SEC alleges, however, that McDonald knew that the payment related not to an ongoing relationship, but to new services to be performed by EDS. Id.

On October 21, 2001, Delphi and EDS entered into the side letter agreement concerning the $20 million payment. Although the letter was not identical to the one approved by McDonald, it contained the same material misleading statements and omissions. Id. at ¶ 82. As a result of these misstatements and omissions, each company felt able to apply opposite accounting treatments to the $20 million payment. Id. EDS chose to read the term "ongoing relationship" to be a reference to the New IT Contract and thus deferred the $20 million expense over time. Id. Meanwhile, Rozanski claimed that the term was a reference to a pre-existing business and therefore Delphi's outside auditor believed that it was appropriate for Delphi to account for the $20 million as income. Id.

The SEC alleges that the improper accounting for the $20 million payment was reflected in Delphi's Form 10-K for the period ended December 31, 2001, as filed with the SEC on February 12, 2002. Id. at ¶ 5. The SEC also says that in connection with its June 30, 2005 restatement, Delphi has now accounted for the $20 million payment as a liability to EDS rather than as a reduction in expense. Id.

41

## B. McDonald's Arguments

McDonald says that the complaint fails to state a viable aiding and abetting claim against him. He also says that the Court should sever the SEC's claims against him and transfer the case to the Northern District of Texas.

## C. Analysis

## 1. Aiding and Abetting

As noted above, under Section 20(e) of the Exchange Act, "a person may be held as an aider and abettor only if some other party has committed a securities law violation, if the accused party had a general awareness that his role was part of an overall activity that is improper, and if the accused aider-abettor knowingly and substantially assisted the violation." SEC v. Coffey, 493 F.2d 1304, 1316 (6th Cir. 1974).

McDonald says that the SEC has failed to plead his "general awareness" of the improper activity, i.e. that Delphi intended to commit fraud with respect to the IT Payment Scheme. To determine whether an alleged aider and abettor had a "general awareness" that his activity was improper, the Court must consider the surrounding circumstances and expectations of the parties. SEC v. Washington County Utility District, 676 F.2d 218, 226 (6th Cir. 1982). "[T]he defendant must have knowledge of the wrongful character of the activity, not merely knowledge of the activity which led to the wrong." Vidosh v. Holsapple, 1987 WL 273164, *17 (E.D. Mich. 1987).

The SEC says that it has adequately plead McDonald's general awareness based on (1) him being an accountant for twelve years and an expert in GAAP, (2)

being warned by another EDS accountant that Delphi was looking for a way to record the $20 million payment as income and engage in questionable accounting practices, (3) his review of drafts of the side letter which were drafted in a way to reveal the true nature of the transaction and consistent with the other EDS accountant's warnings.

The Court is satisfied that the allegations are sufficient to plead McDonald's awareness of the improper activity. Based on his expertise, he knew, or was reckless in not knowing, that the $20 million payment should be treated as a loan to Delphi, ir at the least deferred over 5 years, but should not considered fourth quarter income. The side letter, of which McDonald is alleged to have been involved, was integral to the IT Payment Scheme.

McDonald also argue that the SEC does not allege that he knowingly and substantially assisted in the IT Payment Scheme. This argument ignores the allegations in the complaint to the contrary. As to knowledge, the SEC specifically alleges that McDonald <u>knew</u> Delphi intended to fraudulently treat EDS's $20 million payment as income, because he reviewed the draft side letters and because of the other EDS's accountant's warning, and based on his December 19, 2001 e-mail. Thus, the SEC has plead that McDonald had knowledge that his actions were improper.

As to substantial assistance, the SEC details specifically the various draft versions of the side letter and alleges that McDonald's failure to disclose the contents of the side letters and the true purpose of the transaction substantially assisted in the perpetration of the fraud, i.e. misstating the $20 million as income. As the SEC put it:

> McDonald's assistance was not only substantial, but almost certainly necessary to Delphi's fraud. He intentionally approved vague language in a side letter, rather than insisting on language that was straightforward and clear in

43

describing what the latter was for, and what it related to. Based on the warnings he received, it is reasonable to infer that he approved the vague language because he knew that EDS's customer - Delphi - with whom EDS was on the cusp of signing a New IT Contract worth almost $200 million to EDS – wanted to account for the $20 million as fourth quarter income. There was no conceivable benefit to EDS in making the letter vague, other than to assist its customer in fraud. Indeed, by making the letter so vague, McDonald actually risked that EDS's own auditors could have concluded that the $20 million expense should have been recorded immediately, rather than deferred over time.

SEC's brief at p. 15-16. These allegations are sufficient to plead that McDonald had a general awareness of the impropriety of his actions and knowingly proceeded in a way that substantially assisted the IT Payment Scheme which resulted in the false and misleading Form 10-K filing.

## 2. Severance and Transfer

McDonald alternatively asks that the claim against him be severed and transferred to the Northern District of Texas. Fed. R. Civ. P. 21 provides:

Misjoinder of parties is not ground for dismissal of an action. Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just. Any claim against a party may be severed and proceeded with separately.

The decision to sever is within the Court's discretion. Safeco Ins. Co. of America v. City fo White House, Tenn., 36 F.3d 540, 547 (6th Cir. 1994).

Because a severed claim becomes a separate case, it may be transferred. McDonald asks to transfer the case to the Northern District of Texas under Section 1404 Precision also moves to transfer venue to the Norther District of Illinois under 28 U.S.C. § 1404(a), which permits a district court to transfer "any civil action to any other district or division where it might have been brought." A district court, however, "has broad discretion to grant or deny a motion to transfer [a] case." Phelps v. McClellan, 30

44

F.3d 658, 663 (6th Cir. 1994) (quoting <u>Cote v. Wadel</u>, 796 F.2d 981, 985 (7th Cir. 1986)).  The Court gives deference to the Plaintiff's choice of forum, and "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."  <u>Stewart v. Dow Chemical Co.</u>, 865 F.2d 103, 106 (6th Cir. 1989) (quoting <u>Gulf Oil Co. v. Gilbert</u>, 330 U.S. 501, 508-09, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947)).

To transfer an action under 28 U.S.C. 1404(a) the following criteria must be met: (1) the action could have been brought in the transferee district court; (2) a transfer serves in the interest of justice; and (3) transfer is in the convenience of the witnesses and parties.  <u>International Show Car Ass'n v. ASCAP</u>, 806 F. Supp. 1308, 1310 (E.D. Mich. 1992).  The following factors must also be considered:  (1) the convenience of the parties; (2) the convenience of the witnesses; (3) the relative ease of access to sources of proof; (4) the availability of process to compel attendance of unwilling witnesses; (5) the cost of obtaining willing witnesses; (6) the practical problems associated with trying the case most expeditiously and inexpensively; and (7) the interest of justice.  <u>Id</u>. at 1310 (citations omitted); <u>Helder v. Hitachi Power Tools</u>, 764 F. Supp. 93, 96 (E.D. Mich. 1991).  In short, the Court may consider any factor that may make any eventual trial "easy, expeditious, and inexpensive."  <u>Gulf Oil</u>, 330 U.S. 501 (1947).

McDonald says a severance is warranted for two reasons.  First, he says that the Complaint alleges his involvement in only one scheme - the IT Payment Scheme and the SEC only alleges that McDonald aided and abetting in that scheme.  The complaint does not allege, however, that McDonald had any contact with the Delphi employees who purportedly orchestrated the scheme or involved in inappropriately accounting for the $20 million.  Second, he says that he will suffer substantial prejudice if a severance is not ordered.

While the Court is mindful of McDonald's concerns, the fact is that the SEC has

alleged his involvement in one of the schemes and there will be a significant overlap in evidence presented against McDonald and the other defendants alleges to be involved in the scheme (Kudla, Rozanski, and Free).  Moreover, in order to prove an aiding and abetting claim, the SEC must also prove a primary violation, which it says it intends to do via the conduct of the Delphi employees.  Moreover, appropriate jury instructions will make clear as to McDonald's limited role in the overall conduct.  Finally, any request for severance is premature given that no discovery has been conducted and it is possible that there may be other ways in which McDonald's role overlaps.  The Court, however, will deny the request for severance without prejudice.

As to a transfer, McDonald's main argument is that it would be more convenient for him to defend the case in Texas, where he resides.  While the Court is mindful of the imposition on McDonald, the circumstances do not warrant a transfer.

### VIII.  Conclusion

For the reasons stated above, defendants' motions to dismiss are DENIED. McDonald's motion for severance is DENIED WITHOUT PREJUDICE.

SO ORDERED.

Dated:  October 8, 2008                          s/Avern Cohn                              
                                                 AVERN COHN
                                                 UNITED STATES DISTRICT JUDGE

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, October 8, 2008, by electronic and/or ordinary mail.

                                                 s/Julie Owens                             
                                                 Case Manager, (313) 234-5160