UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


U.S. SECURITIES AND
EXCHANGE COMMISSION,

      Plaintiff,

                                    Case No. 06-14891

-vs-                                 Hon:  AVERN COHN

J.T. BATTENBERG, III and
PAUL FREE,

      Defendants.
_____/


## DECISION AND ORDER DENYING PAUL FREE'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR NEW TRIAL (Doc. 336)[1]

---

[1]The Court deems this matter appropriate for decision without oral argument. See Fed. R. Civ. P. 78(b); E.D. Mich. LR 7.1(f)(2).

# <u>TABLE OF CONTENTS</u>

I.     Introduction    1

II.    Background    1

III.    Legal Standard    3

IV.    Free's Motion    4

V.    The Verdict    5

    A.    The Questions    5

    B.    The Answers    6

VI.    The Law of the Case: Jury Instructions    7

    A.    Violations of Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10B-5    7

        1.    Generally    7

        2.    First Element - False or Misleading Statements    7

        3.    Second Element - Scienter    8

        4.    Good Faith Reliance on Counsel    9

    B.    Violation of Section 17(a) of the Securities Act of 1933    9

    C.    Aiding and Abetting Delphi's Violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13    9

        1.    Generally    9

        2.    Violation of Section 20(e) of the Exchange Act    10

        3.    Alleged Violations by Delphi    10

            (a)    Delphi's Violation of Section 13(a) And Rules 12b-20, 13a-1, and 13a-13 [Reporting Provisions]    10

|  | (b) | Delphi's Violation of Section 13(b)(2)(a) [Books and Records] | 11 |
|  | (c) | Delphi's Violation of Section 13(b)(2)(B) [Internal Controls] | 11 |
| | 4. | General Awareness of Wrongdoing | 12 |
| | 5. | Knowingly Rendered Substantial Assistance | 12 |
| D. | | Violations of Section 13(b)(5) of the Exchange Act [Falsifying Books and Records] | 13 |
| E. | | Violations of Rule 13b2-1 under the Exchange Act [Falsifying Books and Records] | 13 |
| F. | | Violations of Rule 13b2-2 under the Exchange Act [Falsifying Information to Accountants] | 14 |
| VII. | | Additional Comment on the Law of the Case | 14 |
| A. | | Materiality and Scienter | 14 |
| B. | | Waiver of Error | 16 |
| VIII. | | Free's Role at Delphi | 16 |
| IX. | | The Transactions | 17 |
| A. | | GM Transaction | 18 |
| | 1. | Nature of the Transaction | 18 |
| | 2. | Relevant Exhibits | 18 |
| | 3. | Free's Role | 20 |
| | 4. | Jury's Finding | 20 |
| B. | | Bank One Transaction | 21 |
| | 1. | Nature of the Transaction | 21 |

|   |   | 2. | Relevant Exhibits | 21 |
|   |   | 3. | Free's Role | 23 |
|   |   | 4. | Jury's Finding | 23 |
|   | C. | BBK Transaction | | 24 |
|   |   | 1. | Nature of the Transaction | 24 |
|   |   | 2. | Relevant Exhibits | 24 |
|   |   | 3. | Free's Role | 25 |
|   |   | 4. | Jury's Finding | 26 |
|   | D. | EDS Transaction | | 26 |
|   |   | 1. | Nature of the Transaction | 26 |
|   |   | 2. | Relevant Exhibits | 26 |
|   |   | 3. | Free's Role | 27 |
|   |   | 4. | Jury's Finding | 27 |
| X. | Free's Credibility/State of Mind | | | 27 |
| XI. | Motion for New Trial | | | 30 |
| XII. | Conclusion | | | 31 |

I.  Introduction

This is a securities fraud case.  Following twenty-nine days of trial, on January 13, 2011, a jury returned a verdict in favor of plaintiff, the Securities and Exchange Commission (SEC) and against defendants J.T. Battenberg, III and Paul Free for violating various securities law and rules.  A partial judgment on liability entered on March 8,2011.  (Doc. 343)

Before the Court is Free's renewed motion for judgment as a matter of law or fr a new trial.  (Doc. 336)  For the reasons that follow, the motion is DENIED.[2]

II.  Background

The case arises out of the filing of false financial reports with the SEC by Delphi, particularly for the 3rd quarter of 2000, Form 10-Q, (PX 140a) and the year ended 2000 Form 10-K, (PX 163a).  Delphi filed a restated financial report for the year ended 2004, Form 10-K, (PX 168a), which acknowledged the falsity of earlier filings.  Importantly, the restatement, filed with the SEC on June 30, 2005, states in part at p. 41:

> (d)    Inventory disposal transactions
>
>    In 2000 and 2001, Delphi entered into several transactions, in each case improperly recording the transaction as a disposal of inventory to a third party and repurchasing the same inventories in subsequent periods.  Each of these transactions should have been accounted for as a financing transaction, not a disposal.
>
>                . . .
>
> (e)    Warranty settlements with former parent company
>
>    Delphi improperly accounted for $202 million in cash

---

[2]The SEC has withdrawn its claim against Free for violating section 17(a)(2) of the Securities and Exchange Act of 1933.  Thus, Free is entitled to judgment as a matter of law on this claim.  An amended judgment to this effect shall enter.

> payments made to its former parent in calendar year 2000 as a pension settlement agreement. The payment should have been accounted for as a settlement of warranty claims and should have been expensed or charged against the warranty accrual in 2000 rather than reflected as an adjustment to post retirement obligations and amortized over future periods.

The case was initiated on October 30, 2006, with the filing of a 160-page complaint naming Delphi and thirteen (13) individuals as defendants. By the time the case went to trial, Delphi and ten (10) of the individuals had settled with the SEC, and one (1) individual was dismissed. Attached as Exhibit A is a chart displaying the names and relevant data regarding pretrial terminated defendants. Battenberg, Chief Executive Officer of Delphi at the time of the filing of the false financial reports as well as the restatement, and Free, Controller and Chief Accounting Officer of Delphi at the time of the filing of the false financial reports went to trial.

Four (4) separate financial transactions were in issue at the trial. These transactions have been referred to variously in the record. They are: (1) the GM Settlement Transaction (GM Transaction); (2) the Bank One - Precious Metals Transaction (Bank One Transaction); (3) the BBK - Cores and Batteries Transaction (BBK Transaction); and the (4) EDS - $20 Million Dollar Transaction (EDS Transaction).

At the conclusion of the trial, a jury found Battenberg and Free were negligent in the reporting of the GM Transaction, as well as negligent regarding maintenance of internal controls, and negligent in statements made to the accountants for Delphi relating to the transactions.

2

As to the Bank One, BBK and EDS Transactions, the jury found Free not only negligent, but responsible for making untrue statements of material fact, making statements that were false and misleading, and making statements with reckless disregard for their truth.

### III.  Legal Standard

Judgment as a matter of law is appropriate where, after a party has been fully heard on an issue, there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.  Fed. R. Civ. P. 50(a); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 236 (6th Cir. 2003). When reviewing a motion for a judgment as a matter of law based on insufficiency of the evidence, the court should not weigh the evidence, evaluate the credibility of witnesses, or substitute its judgment for that of the jury; rather, it must view the evidence in a light most favorable to the party against whom the motion is made, and give that party the benefit of all reasonable inferences. *Arban v. West Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003).  The motion should be granted "only if a complete absence of proof exists on a material issue in the action, or if no disputed issue of fact exists on which reasonable minds could differ."  *Karam v. Sagemark Consulting, Inc.*, 383 F.3d 421, 426-27 (6th Cir. 2004) (quoting *LaPerriere v. Int'l Union UAW*, 348 F.3d 127, 132 (6th Cir. 2003)).

Rule 59(a) of the Federal Rules of Civil Procedure states:  "A new trial may be granted to all or any of the parties and on all or part of the issues (1) in any action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States . . . ."   The Supreme Court has stated that the authority to grant new trials under Rule 59(a) "is

3

large" and that authority to grant a new trial exists "if the verdict appears to [the judge] to be against the weight of the evidence." *Gasperini v. Ctr. for the Humanities, Inc.*, 518 U.S. 415, 433 (1996). Nonetheless, the motion should be denied if the verdict is one which could reasonably have been reached; and the verdict should not be considered unreasonable simply because different inferences and conclusions could have been drawn or because other results are more reasonable. *Walker v. Bain*, 257 F.3d 660, 670 (6th Cir. 2001).

Circuit Judge Taft, in an early Sixth Circuit case, *Felton v. Spero*, 78 F. 576, 581 (6th Cir. 1897), put it this way:

> [T]he motion for new trial is a remedy accorded to a party litigant for the correction by the trial court of injustice done by the verdict of a jury. It is one of the most important rights which a party to a jury has. It is a right to invoke the discretion of the court to decide whether the injustice of the verdict is such that he ought to have.

## IV.  Free's Motion

The essence of Free's motion is best stated by the SEC in its response::

> [Free] urges the Court to view the evidence as isolated, unconnected pieces, rather than as a whole. Applying the correct standard of review, Free's Rule 50 motion. . . is without merit. . . .

(Doc. 341, at p. 11). As stated in *SEC v. Adler*, 137 F.3d 1325, 1342 (11th Cir. 1998):

> . . .fact-intensive issues should be decided by a jury, which is in a position to observe the demeanor of witnesses and make appropriate credibility determinations.

This is particularly true with regard to Free's testimony regarding his knowledge of the four (4) transactions. As will be explained, Free had a responsibility for the accuracy of financial statements published by Delphi. While Free presents several arguments in

4

support of his motion, chief among them is that he did not have the requisite state of

mind, particularly as to the transactions in which the jury found he engaged in fraud, i.e.

scienter.  Based on the totality of the evidence, however the jury could reasonably have

concluded that his testimony as to his knowledge was not credible and that Free did in

fact act with scienter.[3]

Free's arguments are extremely detailed in their review of the evidence at trial

(32 witnesses for the SEC; 8 witnesses for Free; and over 200 exhibits by the parties).

The SEC has responded in a like way.

The Court is not a 13th juror, as Free would have it.  The law and evidence at trial

largely tracks the Memorandum and Order Denying Defendants' Motions To Dismiss

(Doc. 96),[4] and Plaintiff Securities And Exchange Commission's Amended Statement Of

Facts (Doc. 189) filed as part of the summary judgment proceedings in the case.

Summary judgment was denied as to Free, as well as to Battenberg and defendant

Milan Belans, several months before trial (Doc. 212).  To adequately explain the jury's

findings in light of the evidence, an examination of what the jury was asked to do and

what it found is in order.

V.  The Verdict

A.  The Questions

As to each of the four (4) transactions, the jury was asked to answer eight (8)

questions.  Each question referenced the applicable instructions.  The questions are:

---

[3]Free's scienter is further addressed in Part X., *infra*.

[4]*S.E.C. v. Delphi Corp.*, 2008 WL 4539519 (E.D. Mich. Oct. 8. 2008).

5

1.      That one or more of the defendants listed below violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 (Fraud Violations).

2.      That one or more of the defendants listed below violated Section 17(a)(2) of the Securities Act of 1933 (Fraud Violations).

3.      That one or more of the defendants listed below violated Section 20(e) of the Securities Exchange Act of 1934 by aiding and abetting a violation by Delphi Corporation of Section 13(a) of the Securities Exchange Act of 1934 and Rules 13a-1, 13a-13 and 12b-20 (Reporting Provisions).

4.      That one or more of the defendants listed below violated Section 20(e) of the Securities Exchange Act of 1934 by aiding and abetting a violation by Delphi Corporation of Section 13(b)(2)(A) of the Securities Exchange Act of 1934 (Books and Records).

5.      That the defendant listed below violated Section 20(e) of the Securities Exchange Act of 1934 by aiding and abetting a violation by Delphi Corporation of Section 13(b)(2)(B) of the Securities Exchange Act of 1934 (Internal Controls).

6.      That one or more of the defendants listed below violated Section 13(b)(5) of the Securities Exchange Act of 1934 (Books and Records).

7.      That one or more of the defendants listed below violated Rule 13b2-1 promulgated under the Securities Exchange Act of 1934 (Books and Records).

8.      That one or more of the defendants listed below violated Rule 13b2-2 promulgated under the Securities Exchange Act of 1934 (Misrepresentations to Accountants).

### B.  The Answers

As to Battenberg and Free, the jury answered _no_ to questions 1 through 5, and _yes_ to questions 6 through 8 on the GM Transaction.  As to Free, the jury answered _yes_ to questions 1 through 8 on the Bank One Transaction, the BBK Transaction and the

6

EDS Transaction.

## VI.  The Law of the Case:  Jury Instructions

The law of the case is reflected in the instructions to the jury.  The questions the jury was required to answer related to each of the individual transactions.  The following are excerpts of the relevant portions:

A.  Violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5[5]

### 1.  Generally

> The SEC's first claim asserts that the defendants violated Section 10(b) of the Securities Exchange Act of 1934 (which I will refer to as the Exchange Act) and Rule 10b-5.  To prove this claim, the SEC must establish as to a defendant:

> First, that a defendant directly or indirectly made any untrue statement of a material fact . . . .

> Second, that a defendant acted with scienter, that is to say with intent to defraud or with reckless disregard for the truth.

### 2.  First Element - False or Misleading Statements

> The SEC can satisfy the first element by showing that a defendant made a statement of material fact that was false or misleading. . . .

> The false or misleading statement. . . may have been in any public report or document that was filed with the SEC or that was otherwise made available to members of the public, if the defendant prepared the report or document, or if he signed it or if he approved it to be filed.

> The SEC is not required to prove that any investor relied upon the alleged misrepresentation or omission or that the misrepresentation. . .caused any investor to lose money.

> . . .

---

[5]This is the first question as to each transaction.

7

A fact stated . . . is "material" if there is a substantial likelihood that it would have been significant to a reasonable investor making an investment decision.  The issue is whether the . . . stated fact would have significantly altered the total mix of information available to the investor.

The phrase "total mix of information" does not mean that a fact when viewed in isolation might have been important to an investor, but rather it means that when taken into account with all the other available information, a reasonable investor would consider it important in making an investment decision.

"Material" facts may include, for example, information about the income, earnings and distributions of a company, or facts which affect the probable future of the company, and facts which may affect the desire of investors to buy, sell, or hold the company's securities, or the price they would pay to buy or sell the securities.

### 3.  Second Element - Scienter

The second element the SEC must establish to prevail on a Section 10(b) claim is that each defendant acted with scienter, that is he acted with intent to defraud or with reckless disregard for the truth.

Intent to defraud in the context of the securities laws means to act knowingly and with intent to deceive.  Knowingly means to act intentionally and deliberately.

Reckless conduct is highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable person would have known it.

A reckless disregard of the truth or a reckless failure to acquire knowledge that would lead a defendant to conclude that his statements were false satisfies the scienter requirement.

Mistake, inadvertence, or even inexcusable negligence do not satisfy the scienter requirement.

### 4.  Good Faith Reliance on Counsel

8

In determining whether a defendant acted with scienter, intent to defraud or deceive, recklessly or negligently, you may consider whether that defendant relied in good faith on the advice of counsel.  Reliance on counsel is a means of demonstrating evidence of good faith, a relevant consideration in evaluating a defendant's state of mind.  In determining whether reliance on counsel was in good faith, you may consider, among other things, whether the defendant sought the advice of competent counsel; whether the defendant gave counsel all the relevant facts known to him at the time; whether the defendant obtained information or advice from counsel; and whether the defendant relied in good faith on that advice.

However, where a defendant knew that the financial statements were false or misleading and went ahead and filed them anyway, the willingness of a lawyer to give an unqualified opinion with respect to them does not negate the existence of the requisite intent to defraud or establish good faith reliance.

   B.  Violation of Section 17(a) of the Securities Act of 1933[6]

The SEC has withdrawn this claim as to Free.  See n. 2, *supra*.

C.  Aiding and Abetting Delphi's Violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13[7]

     1.  Generally

The SEC claims that Battenberg and Free each violated Section 20(e) of the Exchange Act by aiding and abetting Delphi's violations of Sections 13(a) and 13(b)(2)(A) and Rules 12b-20 and 13a-1 and 13a-13.

The SEC claims that Free also violated Section 20(e) of the Exchange Act by aiding and abetting Delphi's violations of Section 13(b)(2)(B).

     2.  Violation of Section 20(e) of the Exchange Act

---

[6]This is the second question as to each transaction.

[7]These are the third, fourth and fifth questions as to each transaction.

9

To prevail on an aiding and abetting claim under Section 20(e) of the Exchange Act, the SEC must prove against a defendant:

1) that Delphi committed one or more violations of the securities laws as asserted by the SEC;

2) that a defendant had a general awareness that his role was part of an overall activity that was improper; and

3) that a defendant knowingly and substantially assisted another person in violation of the securities laws.

With respect to the second element, the SEC must prove either that a defendant knew that his role was part of an overall activity that was improper, or acted with reckless disregard for the truth.

With respect to the third element, the SEC must prove that a defendant knew that he was rendering assistance, or acted with reckless disregard for the truth.

### 3.  Alleged Violations by Delphi

The first element that the SEC must prove under Section 20(e) is that Delphi violated certain books and records provision [sic] of the securities laws.

#### (a)  Delphi's Violation of Section 13(a) and Rules 12b-20, 13a-1, and 13a-13[8] [Reporting Provisions]

The SEC asserts that Delphi violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13.  Under those laws, companies must file periodic reports with the SEC, including quarterly reports known as the Form 10-Q and annual reports known as the Form 10-K.  These reports must be accurate and not omit information that would otherwise make the information in the reports not [sic] misleading.

---

[8]This is the third question as to each transaction.

10

(b)  Delphi's Violation of Section 13(b)(2)(a)[9]
[Books and Records]

The SEC also asserts that Delphi violated Section 13(b)(2)(A) of the Exchange Act by falsifying its books and records.  In particular, the SEC asserts that both of the defendants aided and abetted Delphi in violating Section 13(b)(2)(A).

In order to establish that Delphi violated Section 13(b)(2)(A), the SEC must prove that Delphi failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company.

The phrase "books, records and accounts" means and includes any of the documents or other records used at Delphi to prepare their financial statements.

The term "records" means accounts, correspondence, memorandums, tapes, discs, papers, books, and other documents or transcribed information of any type, whether expressed in ordinary or machine language.

"Reasonable detail" means the level of detail as would satisfy prudent officials in the conduct of their own affairs.

(c)  Delphi's Violation of Section 13(b)(2)(B)[10]
[Internal Controls]

The SEC also asserts that Delphi violated Section 13(b)(2)(B).  In particular, the SEC asserts that Free aided and abetted Delphi in violating Section 13(b)(2)(B).

In order to establish that Delphi violated Section 13(b)(2)(B), the SEC must prove that Delphi failed to devise and maintain a system of internal accounting controls that are sufficient to provide reasonable assurance that, among other things, transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

_____

[9]This is the fourth question as to each transaction.

[10]This is the fifth question as to each transaction.

11

4.  General Awareness of Wrongdoing

As to the second element of the claim for aiding and abetting, general awareness of wrongdoing means knowledge of wrongdoing.  To be liable, a defendant must have knowledge of the wrongful character of the activity, not merely knowledge of the activity that led to the wrong.

Knowledge of the wrongdoing may be satisfied by proof of reckless conduct.

As I have previously explained, reckless conduct is, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to a defendant or so obvious that a defendant must have been aware of it.

The SEC does not have to show that an aider and abetter knew that he was participating in or contributing to a securities law violation.  However, the SEC must show that a defendant at least had a general awareness that his role was part of an overall activity that was improper.

5. Knowingly Rendered Substantial Assistance

As to the third element, the SEC must show that a defendant knowingly rendered substantial assistance to Delphi in its violations.

To act "knowingly" in this context includes either knowing that the actions are wrongful or being reckless in not knowing.  I have already explained to you what reckless means.  To provide substantial assistance means that a defendant's conduct was a substantial causal factor in the violation by the person who committed the violation.  A defendant's conduct does not have to have been the only cause of the violation.

Silence or inaction may be a form of substantial assistance if you find that the silence or inaction of a defendant was consciously intended to aid Delphi in committing the violations.

A corporate officer's signing, preparing, reviewing, or

12

approving the filing of Forms 10-Q and 10-K may constitute substantial assistance.

### D.  Violations of Section 13(b)(5) of the Exchange Act[11] [Falsifying Books and Records]

The SEC also claims that each of the defendants violated Section 13(b)(5) of the Exchange Act by knowingly falsifying any book, record, or account of Delphi.

In order for you to find that a defendant violated Section 13(b)(5), you must find that the defendant knowingly and consciously undertook to make the falsification or made the falsification with knowing and conscious disregard for the truth.

The phrase "books, records and accounts" means and includes any of the documents or other records used at Delphi to prepare its financial statements.

### E.  Violations of Rule 13b2-1 under the Exchange Act[12] [Falsifying Books and Records]

The SEC contends that the defendants each separately violated Rule 13b2-1.

In order to prevail on this claim, the SEC must prove the following:

(a) that the defendant directly or indirectly falsified or caused to be falsified any book, record, or account of Delphi; and

(b) that the defendant acted unreasonably.

To violate this rule, the defendant did not have to act knowingly, but must have acted at least unreasonably. In order to be liable, the defendant did not have to personally falsify a book, record or account.  The defendant would be liable if the defendant caused anyone else to do that.

---

[11]This is the sixth question as to each transaction.

[12]This is the seventh question as to each transaction.

13

F.  Violations of Rule 13b2-2 under the Exchange Act[13]
[Falsifying Information to Accountants]

The SEC asserts that defendants each violated Rule 13b2-2.
To establish a violation of Rule 13b2-2, the SEC must show
that a defendant, directly or indirectly,

(1) made or caused to be made a materially false or
misleading statement; or

(2) omitted to state, or caused another person to omit to
state, any material fact necessary in order to make
statements made, in light of the circumstances under which
such statements were made, not misleading;

(3) to an accountant in connection with:

(i) any audit, review or examination of the financial
statements of Delphi required to be made under the
rules and regulations of the Exchange Act; or

(ii) the preparation or filing of any document or report
required to be filed with the Commission

. . .

As with Rule 13b2-1, to violate this rule, a defendant did not
have to act knowingly, but must have acted at least
unreasonably.

VII.  Additional Comment on the Law of the Case

A.  Materiality and Scienter

In the denying defendants' motion to dismiss, the Court discussed the securities

laws and rules, and in particular materiality and scienter as follows:

At the pleading stage, a plaintiff satisfies the materiality
requirement. . .by alleging a statement or omission that a reasonable
investor would have considered significant in making investment
decisions.  *Ganino v. Citizens Utility Co.*, 228 F.3d 154, 161 (2d Cir.

---

[13]This is the eighth question as to each transaction.

14

2000); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 563 (6th Cir. 2001).  [T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.  *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) (footnote omitted).

 As to scienter, it is defined as a mental state embracing intent to deceive, manipulate or defraud.  *In re Comshare*, 183 F.3d at 548 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (quotation marks omitted).  Liability under section 17(a)(1), section 10(b), and Rule 10b-5 cannot exist in the absence of scienter on the part of the defendant.  *Aaron v. SEC*, 446 U.S. 680, 691, 697, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980).  Scienter refers to a mental state that embraces an intent on the part of the defendant to deceive, manipulate, or defraud.  *Id.* at 686 & n. 5. [C]onduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities is manipulative.  *Ernst & Ernst*, 425 U.S. at 199.  Because scienter is a mental state, proving its existence with direct evidence is often difficult.  Scienter may be established by the trier of fact, however, by drawing inferences from the facts of the case, including the defendant's conduct and knowledge.  *See, e.g., Meadows v. SEC*, 119 F.3d 1219, 1226-27 (5th Cir. 1997).  In the Sixth Circuit, the requisite scienter may also be established by showing that the defendant acted with recklessness – highly unreasonable conduct which is an extreme departure from the standards of ordinary care.  *SEC v. George*, 426 F.3d 786, 792 (2005) (*quoting Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1025 (6th Cir. 1979)); *accord SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir. 1985).

*S.E.C. v. Delphi Corp.*, 2008 WL 4539519 at *4.

 Importantly, as the Sixth Circuit said in *New England Health Care Employees Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 502 (6th Cir. 2003), *cert. denied*, 540 U.S. 1183, 124 S.Ct. 1424, 158 L.Ed.2d 87 (2004):

 . . .direct evidence of scienter is not necessary to a determination of fraud.  *See, e.g., Herman & MacLean v. Huddleston*, 459 U.S. 375, 390, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) (holding that scienter may be proved with circumstantial evidence).

   B.  Waiver of Error

Free argues that asserts that the Court erred in its disposition of its Rule 50(b) motion at the conclusion of the SEC's proofs.  To the contrary, Free waived any error by putting in a defense.  The Supreme Court long ago said in *Bogk v. Gassert*, 149 U.S. 17, 23 (1893) (citations omitted):

> A defendant has an undoubted right to stand upon his motion for a nonsuit, and have his writ of error, if it be refused; but he has no right to insist upon his exception after having subsequently put in his testimony, and made his case upon the merits, since the court and jury have the right to consider the whole case as made by the testimony.  It not infrequently happens that the defendant himself, by his own evidence, supplies the missing link; and, if not, he may move to take the case from the jury upon the conclusion of the entire testimony.

## VIII.  Free's Role at Delphi

Free was Delphi's Controller and Chief Accounting Officer in 2000 and 2001. Free was the highest ranking financial person at Delphi who was a certified public accountant.  As Chief Accounting Officer, Free had the responsibility for the accuracy of the financial statements published by Delphi, as well as the information furnished Deloitte & Touche at year end.  Free signed the Form 10-Q for the 3rd Quarter of 2000 (PX 140a), and he was one of the signers of the Form 10-K for the year ended 2000 (PX 143a).  As a signer of the 10-K, he certified that the figures and statements in it were true and correct and prepared in accordance with general accounting principles.

Importantly, Free also was one of the signers of the October 11, 2000, Delphi representation letters to Deloitte & Touche (PX 137), and one of the signers of the year-ended December 31, 2000, representation letters to Deloitte & Touche (PX 356 and PX 408).  These letters state in part:

16

> We confirm that we are responsible for the fair presentation
> of the financial information in conformity with generally
> accepted accounting principles.[14]

As will be further explained, the jury by its answers to the verdict questions

reasonably concluded that these letters misrepresented the financial information related

to the periods they covered, and that the financial information was not in conformity with

generally accepted accounting principles, and that Free knew that such financial

information was material, and that Free acted with scienter.

## IX.  The Transactions

The following is a brief description of the four transactions, a description of the

most relevant exhibits related to each transaction, Free's role in the transaction, and the

jury's conclusion.  To the extent the facts of each transaction was contested considered,

it was for the jury to decide.  The relevant exhibits as to each transaction establish both

the misrepresentation of the nature of each transaction, as well as Free's culpability

regarding knowledge of the true nature and the misreporting.  A jury could have

reasonably concluded from the evidence at trial, testimonial and written, that the four

transactions were falsely reported by Delphi and that Free violated the securities laws

and regulations for his role.

---

[14]As revealed at trial, Deloitte & Touche was not furnished the full range of
papers relating to the GM Transaction  The SEC introduced several relevant documents
relating to the GM Transaction which were not given to Deloitte & Touche.  There was
also testimony from Deloitte & Touche that it was not furnished all of the information
necessary to enable it to make an intelligent judgment as to the propriety of the
allocation of the $237 million dollar payment to GM.  There was similar testimony as to
the other transactions in terms of Delphi not sharing certain information with Deloitte &
Touche.  This evidence is compelling in that it illustrates the environment at Delphi with
respect to its disclosure of information to its outside accountants.

A.  GM Transaction

1.  Nature of the Transaction

The GM Transaction involved a claim by General Motors Corporation (GM) for reimbursement by Delphi of its share of liability on 27 pre-separation warranty claims against GM.  Delphi was a spin-off of GM.  Under the spin-off agreement, Delphi was liable for a share of warranty liability of GM for parts manufactured by Delphi while a unit of GM.  The warranty claims were settled by GM and Delphi in September, 2000, by payment by Delphi to GM of $247 million dollars.  The record is void of any GM-Delphi discussions of any Delphi obligations to GM beyond the warranty claims.  GM accounted for the payment as income.  Delphi accounted for the payment differently.  Delphi allocated $35 million dollars to warranty claims as an expense, and allocated $212 million dollars to settlement of pension and other pre-settlement employment claims (OPEB) arising from the spin-off as a capital charge.  The introduction of the OPEB issue into the accounting was wholly unilateral by Delphi.  By so accounting, Delphi's 3rd quarter 2000 earnings, as well as the year ended 2000 earnings, were misstated by $202 million dollars according to the SEC's proofs.

2.  Relevant Exhibits

The relevant exhibits regarding the GM Transaction are as follows:

• PX 30a - this is a May 8, 2000, memorandum which describes open issues relating to the spin-off of Delphi.  It includes a description of the warranty claims.

• PX 76 and PX 77 - these are spreadsheets detailing the warranty claims. Delphi's share of the claims is stated at over $300 million dollars.

• PX 112 - this is a presentation by Alan Dawes, Chief Financial Officer of Delphi,

18

to the Financial Task Team dated September 19, 2000, labeled Warranty Issues

Forecasting and Negotiating, describing in detail the status of the negotiations

with GM regarding the warranty claims.

- PX 127 - This is a memorandum to Dawes and Free noting revisions to the

  Warranty Issue Assessment mailed to them earlier.

- PX 137 - This is a representation letter to Deloitte & Touche, LLP, dated October

  11, 2000, attesting to the fair representations of the financial information

  furnished it as being "in conformity with generally accepted accounting

  principles."

- PX 140a - This is the Form 10-Q filed with the SEC on October 11, 2000.  Pages

  10-11 describe the settlement with GM on the warranty claims and the allocation

  of the $237 Million Dollar settlement.

- PX 168a - This is an excerpt from the Form 10-K filed with the SEC on June 30,

  2005, describing the restatement for the improper allocation of the $237 Million

  Dollar payment to GM.

- PX 173 - This is a Pre-Separation Warranty Discussion Document dated August

  30, 2000, prepared for Battenberg in anticipation of his upcoming meeting with

  Harry Peace, GM's negotiator on the warranty claims, listing the claims and

  noting the maximum Delphi exposure of up to $930 million dollars.

### 3.  Free's Role

The evidence as to Free's involvement was, in summary, as follows:

- He attended the September 19, 2000, meeting of the Delphi Financial Task

  Force Team, at which GM's $270 million dollar warranty claims were identified,

and the $240 to $275 million dollar exposure of Delphi was discussed.

• He saw spreadsheets which displayed in detail each of GM's warranty claims, including the lower and upper ranges.

• He knew that engineers and salespeople at Delphi were checking out the details of GM's warranty claims.

• He knew that it was estimated that four of the GM Warranty claims alone exposed Delphi to a $100 million dollar liability.

• He knew that Delphi and GM ultimately settled on a payment of $237 million dollars.

• He signed off on an allocation of $35 million dollars to warranty claims which was an expense to Delphi, and $202 million dollars as a charge for OPEB, which was a charge to Delphi's capital.

• He knew that the charges to OPEB of $202 million dollars was a unilateral decision of Delphi, and not based on a claim by GM, and that the justification of such a charge as a consequence of the Watson-Wyatt analysis was thin.

#### 4.  Jury's Finding

The jury found Free responsible for books and records violations on this transaction.  Although it did not find that he engaged in fraud related to the reporting of the transaction, the evidence clearly supports a finding that Free knew of the improper nature of the transaction and was at least negligent in his role in reporting it.

### B.  Bank One Transaction

#### 1.  Nature of the Transaction

The Bank One Transaction involved a sale by Delphi of its precious metals

20

inventory *in toto* to Bank One for $199 million dollars, and an agreement by Bank One

to sell back the inventory to Delphi for $202.5 million dollars.  The precious metals were

used by Delphi in the manufacture of catalytic converters.  The sale included precious

metals in inventory as well as in slurry form on the production lines.  The sale increased

Delphi's cash flow for the year ended 2000 by $200 million dollars and income by $6

million dollars.  The SEC maintained that the sale and repurchase was a financing

arrangement to enhance Delphi's cash on hand at year's end.

### 2.  Relevant Exhibits

The relevant exhibits regarding the Bank One Transaction are as follows:

- PX 217 - this is a Credit Approval Summary prepared by Bank One dated

   December 14, 2000, stating in part:

    > the effect of the transaction is to create a $250,000,000
    > (approximately) unsecured 30-day loan to DPH.

- PX 225 - this is an e-mail from Louise Kelly of Delphi to several, dated December

   26, 2000, attached to which is a draft of the purchase agreement.

- PX 229 - this is a memorandum from Milan Belans at Delphi to several,

   transmitting the purchase agreement and confirming the forward purchase

   agreement with Bank One.

- PX 230 - this is the Precious Metals Purchase Agreement.

- PX 228 - this is the Forward Purchase Agreement.

- PX 231 - this is an internal e-mail of Bank One dated December 29, 2000,

   reading in part:

    > Bank One has entered into a transaction with Delphi
    > Automotives to purchase precious metals value Dec. 28

> 2000.  Delphi Automotives have entered into a
> corresponding transaction to buy back the precious metals
> on Jan. 29, 2001.  The transaction was originally booked to
> Murex in the Derivatives area as a Cash flow and a forward.
> Paul Hennessey considers the transaction to be an
> unsecured loan as we are not in pocession [sic] of the
> metals and in fact those metals are being used in the
> manufacturing process.  We met to discuss the implications
> of this on accounting, capital and systems and the following
> was agreed. . . .

• PX 233 - this is a handwritten note dated January 8, 2001, from the Delphi files, noting as to cost of this transaction the "2000 Year End Inventory Financing Costs" is $3,257,841.

• PX 338 - this is a Delphi document entitled Summary of Delphi E/C Year End Inventory Transaction, which includes a description of the Bank One Transaction and includes the following:

> Approximate Hedge Cost is 3.6 Million.

• PX 247 - this is a Delphi memorandum dated February 25, 2005, analyzing the Bank One Transaction describing the restatement, including:

> We have now determined that the two contracts between
> Delphi and Bank One should have been accounted for as a
> single transaction rather than two separate transactions.

• PX 361 - this is a Delphi document labeled "4th Quarter 2000 Structural Finance Initiatives Cost Breakdown," detailing the Bank One Transaction as follows:

> 1.  PGMs

| | |
|---|---|
| Structuring Fee | $2,000,000 |
| Interest Carry | 1,192,841 |
| Other Fees (Bailment, Legal, etc) | 385,000 |
| Total | $3,577,841 |

It includes the notation "given to PRF 2/6/01."

### 3. Free's Role

The evidence as to Free's involvement in this transaction, in summary, is as follows:

- He knew that in the fall of 2000 Delphi targeted significant inventory reduction goals.

- He knew that the sale of the precious metals inventory to Bank One generated substantial income for Delphi for the year ended December 31, 2000.

- He knew that Delphi agreed to buy back the precious metals inventory in 2001.

- He knew that the sale to Bank One and buy back from Bank One occurred over a very short time.

- He was aware that there were questions raised at the time of the buy back as to whether or not a sale had truly occurred.

### 4. Jury's Finding

The jury answered yes to all of the questions regarding the Bank One Transaction as Free. The jury agreed with the SEC that the transaction was a loan and should have been reported as such. The jury also found that Free's knowledge of and role in the transaction made him liable for fraud and for negligent reporting.

### C. BBK Transaction

#### 1. Nature of the Transaction

The BBK Transaction involved a sale by Delphi at the end of December, 2000, of its total inventory of generation cores and after market automobile batteries, which were part of its manufacturing processes, for $70 million dollars to BBK Corporation, not a

23

normal purchaser of such items.  Delphi then repurchased the inventory one week later, in early January 2001, for $70,840,000.00.  Financing for the purchase by BBK was arranged by Delphi.  The SEC maintained that BBK's payment was a loan, and there was no economic substance as to the sale and repurchase.  Rather, the purpose of the sale was to enhance the cash on hand position of Delphi at year end.

### 2.  Relevant Exhibits

The relevant exhibits regarding the BBK Transaction are as follows:

- PX 327 - this is a handwritten Delphi memorandum dated December 5, 2000, relating to the "financial engineering" figure regarding the BBK Transaction.

- PX 233 - this is a handwritten note dated January 9, 2001, from the Delphi files, noting as to the cost of this transaction the "2000 Year End Inventory Financial Costs" is $833,740.

- PX 335 - this is the Inventory Purchase Agreement between BBK and Delphi dated December 27, 2000.

- PX 344 - this is a BBK invoice to Delphi dated January 5, 2001, for the "Cores" and the "Batteries" showing an amount due of $70,846,214.28, with a handwritten "ok to pay," which includes Free's signature.

- PX 361 - this is the Delphi document described above detailing the BBK Transaction as follows:

  |  |  |
  |---|---|
  | Cores and Batteries | |
  | Structuring Fee | $350,000 |
  | Interest Carry | 490,214 |
  | | $840,214 |

- PX 380 - this is a Delphi memorandum dated February 25, 2005, analyzing the

BBK Transaction, describing the restatement, including:

> As part of the audit committee's review of Delphi's accounting practices, certain transactions entered into with BBK during the 2000-20001 time frame have been identified as being accounted for improperly

and including

> In December 2000, March 2001 and December 2001, Delphi entered into inventory sale agreements with BBK. The agreements were accounted for as sales with the inventory de-recognized from Delphi's balance sheet and an account receivable recognized from BBK. We have now determined that Delphi repurchased the inventory sold and effectively financed BBK's initial purchase of the inventory through the GE Supplier Factoring program. As such, the transaction should not have been accounted for as a sale and the inventory should have remained on Delphi's books.

### 3. Free's Role

The evidence as to Free's involvement was, in summary as follows:

• Again, he knew that in the fall of 2000 Delphi targeted significant inventory reduction goals.

• He participated in a telephone conference call with Blahnik, Michael Belans and Laura Marion about the inability of BBK to raise the money to fund the purchase.

• He knew that the sale of cores and batteries to BBK was a year-end event which generated substantial income to Delphi.

• He knew that shortly after year-end, Delphi repurchased the inventory from BBK.

• He knew that Delphi financed the purchase by BBK.

• He knew that as with the Bank One Transaction there were questions raised as to whether or not a sale had actually occurred.

### 4. Jury's Finding

25

Like the Bank One Transaction, the jury answered yes to all of the questions as to Free.  Again, the jury found the proofs established that the transaction was a loan and should have been so accounted.  The jury also found that Free engaged in fraud acted with a high degree of recklessness and was negligent.

### D.  EDS Transaction

#### 1.  Nature of the Transaction

The EDS Transaction involved a $20 million dollar payment in the 1st quarter of 2001 by EDS to Delphi, which was reported by Delphi as a rebate, and thus income. Shortly after, Delphi issued a work order to EDS calling for payment of $333,333.00 a month for a 60-month period.  The SEC took the position that the $20 million dollars was a loan by EDS to Delphi, and should not have been reported as income.

#### 2.  Relevant Exhibits

The relevant exhibits regarding the EDS Transaction are as follows:

- PX 481 - a Decebeer 21 2001 letter from EDS to Delphi "RE:  Summary of Vega 2 Agreements," reading in part:

    > 3.  EDS is providing Delphi with a $20 million loan to help finance the working capital needed for the Vega 2 project. Delphi will pay back the loan in 60 payments of $333,333.33 over five years.  The loan is referred to as "Non-commutable costs" in the contract documents and Delphi is to repay the loan immediately in case of any termination of the Vega 2 Services Agreement.

    > 4.  In order to offset EDS unbilled amounts associated with the loan, Delphi will pay EDS invoices for North American services and equipment 1 month early for a period of 60 months.

- PX 501 - a Vega 2 Service Agreement Work Order dated variously for:

26

Description 1 - Non-commutable Costs
Cost:  $333,333.33 per month

It is signed by Delphi and by EDS Delphi Group which includes Free's signature dated 4/4/02.

### 3.  Free's Role

The evidence as to Free's involvement was in summary, as follows:

• Several persons in the upper levels of Delphi management knew that the $20 Million Dollar payment by EDS was a loan, and that Delphi would have to repay the $20 Million Dollars to EDS

• He signed off on a purchase order from Delphi to EDS for undefined services that called for monthly payments of $333,333.00 for five (5) years.

### 4.  Jury's Finding

The jury answered yes to all of the questions as to this transaction.  They agreed with the SEC that the evidence showed the transaction was a loan and not properly accounted as such.  The jury also found Free liable for fraud and for negligent reporting.

### X.  Free's Credibility/State of Mind

As noted above, in order to find that Free engaged in fraud, which they did as to three of the transactions, the jury had to conclude that Free acted with scienter.  Free in particular says scienter was not established because there was no evidence of motive. As the SEC points out however, motive evidence may be relevant to proving scienter, it is not the sole means of proving scienter.  *See SEC v. Seghers*, 298 F.App.x. 319, 334 (5th Cir. 2008) ("motive, although not alone sufficient, is relevant to showing scienter," it is not an element of securities fraud, *SEC v. Church Extension of the Church of God, Inc.*, No. IP 02-1118-C, 2004 WL 771171, *3, n. 1 (S.D. Ind. March 23, 2004).  *See SEC*

27

*v. Lucent Tech. Inc.*, 610 F. Supp. 2d 342, 363 (D.N.J. 2009) ("motive and opportunity

for committing fraud is one of two ways to plead scienter." )  As this Court previously

held, "recklessness" satisfies the scienter requirement.  *SEC v. Delphi*, 2008 WL

4539519 at *3-4 (E.D. Mich. 2008).  Recklessness is "highly unreasonable conduct

which is an extreme departure from the standards of ordinary care.  While the danger

need not be known, it must at least be so obvious that any reasonable man would have

known it."  *SEC v. George*, 426 F.3d 786, 792 (6th Cir. 2005).

 Free also relies on his testimony and his interpretation of the evidence.

However, there was evidence from which the jury could reasonably conclude that Free's

testimony was not credible and that he did in fact act with scienter.  Such evidence

includes the following:

•  Barbara Novak, Delphi's securities lawyer, Peter Bible, GM's Chief Accounting

 Officer and Catherine Rozanski, Delphi's director of financial accounting and

 reporting each testified as to conversations with Free which could have led the

 jury to doubt his credibility.  Briefly:

> Novak testified to a conversation with Free from which it could be inferred
> that Free was not completely honest in his approach to SEC disclosure
> requirements, and that Free once told her "when there's aggressive
> accounting you don't really want to disclose it because it will be. . .a red
> flag to the SEC, and they'll get into everything."  Tr. Vol. 6, p. 39, l. 4; p.
> 40, l. 1.

The jury could reasonably infer from Novak's testimony that Free attempted to

avoid proper disclosures, and was, therefore, not completely honest in his

approach to SEC disclosure requirements, and consequently he possessed the

requisite state of mind to defraud investors.

- Bible testified to a telephone call to Free about Delphi's accounting for the GM transaction after he read Delphi's 3rd Quarter 2000 Form 10-Q, and that Free was "uncharacteristically abrupt" in his response. Tr. Vol. 5, p. 123, l. 20; p. 124, l. 16.

  From Bible's testimony, the jury could reasonably conclude that Free was not honest with Bible about the accounting for the Delphi-GM settlement, and, therefore, not honest about the accounting for the other three transactions, thereby establishing the requisite state of mind to defraud investors through his deceptive accounting treatments.

- Catherine Rozanski, former Delphi Director of Financial Accounting and Reporting testified that Free asked her to double check the accounting for the EDS Transaction. Free contradicted this testimony. Tr. Vol. 24, p. 210, ll. 1-3. Regarding the EDS Transaction, she was asked why Free assigned her to the transaction despite another accountant, Judith Kudla, having already been involved. Rozanski replied that Free "wasn't comfortable with Judy Kudla's accounting skills and wanted to make sure we accounted for it correctly." Tr. Vol. 15, p. 135, ll. 13-17. During cross-examination, Free contradicted Rozanski.s testimony, declaring "no" when asked if he assigned Rozanski to the EDS transaction because he did not trust Kudla. Tr. Vol. 15, p. 135, ll. 13-17. This is but one example of Free contradicting the testimony of other witnesses. In assessing Free's credibility, the jury may well have concluded that he was not truthful in responses to questions on points made by other witnesses, and they may well have discounted much of his testimony, which they were permitted to

29

do.

•     Laura Marion, former Delphi Director of Financial Accounting and Reporting,

testified that Free asked her to perform an analysis of the Bank One-PGM and

BBK-Cores and Batteries transactions, and that her analysis is reflected in SEC

Trial Exhibit 361, which she gave to Free on February 6, 2001.  Delphi's Form

10-K for 2000, which contained the results of Free's improper accounting, was

not filed with the SEC until February 8, 2001.  Tr. Vol. 12,  p. 170, ll. 6-8. Marion's

written analysis clearly shows that the Bank One-PGM transaction cost Delphi $2

million in structuring fees, $1,192,841 in interest carrying costs, and $385.000 in

other fees, e.g., bailment, legal, etc.  *See* PX 361.  The jury could reasonably

conclude from Laura Marion's testimony that Free asked for and was provided

with the information on PX 361 prior to Delphi's filing of its Form 10-K for 2000

with the SEC.

## XI.  Motion for New Trial

Free seeks in the alternative a new trial under Rule 59. Free relies upon the

same arguments he advanced in support of his Rule 50 motion in arguing for a new trial

under Rule 59.  As explained above, sufficient evidence supports the jury's reasonable

verdicts against Free in this case.  Free is not entitled to a new trial.

## XII.  Conclusion

In the end, Free has not offered any compelling reasons for the Court to either

set aside the jury's finding him culpable on the misreporting of the four transactions, or

to give him a second opportunity to persuade a new jury to find otherwise.  The SEC's

proofs at trial were such that for the Court to set aside the verdict as to any of the

transactions would be substitution of its judgment for that of the jury.

The SEC is correct when it says:

> Contrary to proper Rule 50 standards, Free urges the Court to view the evidence in the light most favorable to him, and to ignore facts that support conclusions contrary to his. Free persists in taking evidence out of context, and in advancing only his interpretations of the evidence. As the Court is aware, the SEC presented substantial evidence at trial from which a reasonable jury was able to reach the verdicts returned; therefore, Free's Rule 50 motion must be denied with the exception of the Section 17(a)(2) claims. Moreover, because Free fails to show that the verdicts were against the weight of the evidence and could not reasonably have been reached, his Rule 50 motion for new trial must also be denied.

Particularly pertinent is what the SEC says in a footnote:

> *See Brown v. Parker Drilling Offshore Corp.*, 410 F.3d 166, 185 (5th Cir. 2005) (movant's entire Rule 50 argument were based upon "its interpretation of the evidence in the light most favorable to its case, relying almost exclusively on its own credibility determinations"), *cert denied*, 549 U.S. 952 (2006).

SO ORDERED.

_____

  S/Avern Cohn_____
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated:  August 9, 2011

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, August 9, 2011, by electronic and/or ordinary mail.

  S/Julie Owens_____
Case Manager, (313) 234-5160